**CLARK GULDIN**
Attorneys At Law
20 Church Street – Suite 15
Montclair, New Jersey 07042
(973) 707-5346 (ph)
(973) 707-7631 (fax)
*Attorneys for Plaintiff*
*Christian Charles*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **CHRISTIAN CHARLES,**<br><br>Plaintiff,<br><br>v.<br><br>**JERRY SEINFELD, COLUMBUS 81 PRODUCTIONS, INC., EMBASSY ROW, LLC, COMEDIANS IN CARS, LLC, SONY PICTURES TELEVISION INC., NETFLIX, INC.**<br><br>Defendants. | **Civil Action No. 1:18-cv-01196**<br><br>**(AJN-KHP)** |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**PAGES**

**TABLE OF AUTHORITIES** ........................................................ iii

**PRELIMINARY STATEMENT** .................................................. 1

**STATEMENT OF FACTS** ........................................................... 3

    **During a meeting at a diner, Seinfeld gratefully embraces Charles's concept for CICGC, and the two agree that Charles will now develop the project and prepare for the test shoot that ultimately becomes the Pilot  5**

    **Between the Princess Diner meeting and the shoot, Seinfeld made various suggestions to Charles.  But during the shoot, he couldn't wrap his head around what Charles was doing, and backed out of the project, claiming he didn't know what the show was about  7**

    **Charles was distressed, but not defeated. He completed shooting and editing the Pilot and sent it off to Seinfeld  7**

    **Once the rough footage had been assembled into the pilot – solely by Charles, and through his ingenuity and creativity – Seinfeld suddenly understood  7**

    **Other players enter the picture  8**

    **A schism develops  9**

    **Things begin to fall apart  9**

    **While Estonilo and Liebling deal with mouseROAR's reimbursement for production expenses, Charles's representatives – with Liebling's knowledge – had been engaging in now-suspended discussions with Embassy Row about Charles's deal and backend compensation as CICGC's creator/director  11**

    **Still optimistic because of assurances from Liebling and Shapiro, Charles continues to hope that the situation can be resolved, but is uncertain how to proceed  13**

    **Charles realizes he can no longer wait for Seinfeld to do the right thing  15**

**LEGAL STANDARD** ................................................................. 16

**ARGUMENT** ............................................................................ 16

**POINT I**: SOME OF the DEFENDANTS' ARGUMENTS FOR
DISMISSAL – SPECULATIVE AND MISINFORMED –
ARE SIMPLY SPURIOUS; DISCOVERY IS NECESSARY
TO DETERMINE THE TRUTH .................................................... 16

• CHARLES DID NOT RELEASE HIS CLAIMS ................................... 17

• THE ONLY FRAUD ON THE COPYRIGHT OFFICE WAS
  COMMITTED BY DEFENDANTS ....................................... 17

• ALTHOUGH DEFENDANTS IDENTIFY NO
  COPYRIGHTABLE CONTRIBUTION BY SEINFELD,
  CHARLES'S EXTENSIVE CONTRIBUTIONS ARE CERTAIN
  AND WELL-DEFINED ........................................................ 18

**POINT II**: THIS CASE IS UNQUESTIONABLY ABOUT
AUTHORSHIP BECAUSE COPYRIGHT OWNERSHIP IS
DETERMINED BY AUTHORSHIP, AND BOTH THE
INFRINGEMENT CLAIM AND THE JOINT AUTHORSHIP
CLAIM ARE TIMELY ............................................................... 21

A. THE JOINT AUTHORSHIP CLAIM IS NOT TIME-BARRED .......... 22

B. THE INFRINGEMENT CLAIM IS NOT TIME-BARRED ................ 24

**POINT III**: THE STATE LAW CLAIMS SHOULD
SURVIVE A MOTION TO DISMISS ......................................... 25

**CONCLUSION** ....................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**CASES**        **PAGES**

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................ 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) ........................................ 22

*Brownstein v. Lindsay*, 742 F.3d 55 (3d Cir. 2014) ...................................... 22

*16 Casa Duse, LLC v. Merkin,* 791 F.3d 247 (2d Cir. 2015)......................... 20, 24

*Eden Toys, Inc. v. Marshall Field & Co*., 675 F.2d 498, (2d Cir.1982). ....................................... 19

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)) .................................................................................... 19

*Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir.2015) ("*Garcia* (*en banc*)") ................................ 20

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996 (2d Cir. 1995).   ................................. 19, 20

*Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011 ...................................... 23

*Petrella v. Metro-Goldwyn-Mayer, Inc.,* 134 S.Ct. 1962 (2014), 188 L.Ed.2d 979 .............. 24, 25

*Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir. 1970).................................... 20

*Stone v. Williams,* 970 F.2d 1043, 1049 (2d Cir/.1992)................................ 25

## RULES & STATUTES

Fed. R. Civ. P 12(b) (6) ................................................................................ 22, 24

Fed. R. Civ. P 50(a)........................................................................................ 22

17 U.S.C. §201 (a) ......................................................................................... 1, 21

[iii]

17 U.S.C._§504 .................................................................................................................... 25

## PRELIMINARY STATEMENT

No matter how many times Defendants insist this case is simply about copyright *ownership*, wishing cannot make it so.  Plaintiff Christian Charles is suing to establish his *authorship* of the first episode – the "Pilot" – of Defendants' successful internet streaming show "Comedians in Cars Getting Coffee" ("CICGC").  If indeed the case were to skip right past the core question of copyright *authorship* and focus on the secondary question of *ownership* of the CICGC Pilot, Defendants would lose solely because nothing in the actual factual history provides the smallest hint of how defendant Jerry Seinfeld ("Seinfeld") and his co-Defendants can claim ownership of the Pilot, except through an arrogant display of self-entitlement pursued through egregious thefts and frauds.

The fundamental problem with Defendants' repeated insistence that the case turns on *ownership* is that it ignores the core principle of copyright ownership set out in 17 USC § 201(a): "Initial Ownership – Copyright in a work protected under this title vests initially in the author or authors of the work." Stated more directly, you own no copyright unless you are its author, or obtain it from the author in whom it initially vested.

Resolution of this case depends upon the answer to one simple question: who is the *author* of the CICGC Pilot.  There are only three possible answers: Mr. Seinfeld, Mr. Charles, or both jointly.  And unless Mr. Seinfeld can show he was the *sole* author – which he has not and cannot – or that he obtained ownership from Mr. Charles – which he did not – Mr. Seinfeld was never the sole owner of CICGC, and Defendants' motion to dismiss must be denied.

Defendants' memorandum tells a very good story.  But like many good stories, it is imaginative fiction, told by a masterful spin doctor.  Through a filter of self-importance, arrogance and greed, Jerry Seinfeld and his co-Defendants distort history and fail to acknowledge irrefutable facts – allowing them to mischaracterize what this case is about.  Conspicuously absent from Defendants' belligerent narrative is the slightest whisper of what *copyrightable* contribution Seinfeld might have made to the creation of CICGC.

Christian Charles is a soft-spoken Englishman.  His wife, Anne Estonilo – President of mouseROAR – the production company they co-own with Anne's brother-in-law – is an even softer-spoken Filipina.  The Charleses are not ones to engage in name-calling.  They do not relish the position into which Seinfeld has placed them.  But when from Defendants' pen so much inflammatory rhetoric flows– including misinformed and myopic allegations of fraud – they will not stand mute.  Everyone knows that Seinfeld is

a great stand-up comedian; but he is a woefully inadequate "stand-up guy."  If Seinfeld deluded himself and then misled and defrauded his co-Defendants, their redress lies against him, not Charles.

Charles created a vehicle for Seinfeld that reinvigorated his career.   After Seinfeld's own representatives warned him he needed a jump-start with a new project following his disastrous television outing with "The Marriage Ref," Seinfeld contacted his long-time collaborator Charles for help.  Charles proposed the idea for CICGC to Seinfeld, then single-handedly developed the format, structure and content – the "look and feel" – for the CICGC Pilot.  It is a structure that various commentators have praised as immediately recognizable in the scores of subsequent episodes of CICGC produced to date, each of which is a derivative work.  Defendants do not say, and cannot with a straight face say, subsequent episodes of CICGC are not derivative of the Pilot.

Seinfeld made no creative contributions to the Pilot whatsoever, other than performing in it – and grumbling while doing so.  While his performance certainly became an important element of the finished product, an actor's ad-lib contributions to a film or video do not qualify for independent protection as copyrightable expression under U.S. law.

Defendants assert that Seinfeld is an award-winning writer, producer and director. That may be so. But this lawsuit is not about the things that Seinfeld wrote or produced or directed.  It is about the creation of the Pilot episode of CICGC – from which all subsequent episodes spring as derivative works.  Seinfeld neither wrote nor produced nor directed that Pilot episode.  Charles wrote it; Charles directed it; and Charles and his company mouseROAR produced it.  Seinfeld's silence about what *copyrightable* contribution *he* made to the Pilot is deafening; because he made none.

Nor did Seinfeld ever acquire rights to Charles's contributions – as a work for hire or otherwise. Since Seinfeld made no contribution that could conceivably make him the sole author of the Pilot, and since every episode of CICGC that followed has been derivative of the Pilot, one of two results must follow: (1) either Charles is the sole author of the Pilot, in which event every episode of CICGC streamed during the three years preceding filing this action infringes Charles's copyright; or (2) Seinfeld can establish that his contribution to the Pilot entitles him to joint authorship of the Pilot as a joint work.  In that event his co-author Charles is – and has from the outset been – entitled to 50% of Seinfeld's income from his unilateral licensing of the jointly-owned rights in CICGC.

[2]

Beyond misguided attempts to show that Charles's claims are time-barred, Defendants try every which way to invalidate his claims to authorship, and in the process undercut their own arguments:

- They assert that "as a *director*, [Charles's] 'contribution to an integrated 'work of authorship' such as a film is not itself a 'work of authorship' subject to its own copyright protection" (emphasis added).  But Charles is not claiming authorship solely because he directed the Pilot; and the very Second Circuit case they cite for this irrelevant proposition says there is no free-standing copyright in an actor's ad-lib contribution;

- Defendants claim nothing is original about the shared concept of a show based on people traveling together and engaging in comedic banter, and cite similar shows as "proof" that the concept is generic and not subject to copyright protection."  Are Defendants saying that the Pilot – which continues to stream on defendant Netflix today – isn't copyrightable?  If so, what does Seinfeld claim to own?  What does his alleged copyright protect?

- Talking out of the other side of their collective mouth, Defendants claim that "[o]f course, Mr. Seinfeld's copyrights for each episode of the Show are protected, even if the Show was found to be 'a compilation of unprotectible elements.'"  Once again, the very Second Circuit case Defendants cite explains that authorship can reside in a show's "*total concept and feel*," and "[W]hat is protectible then is 'the author's original contributions' . . . the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work" – which is precisely what Charles did in creating, developing, shooting and editing the Pilot.

Defendants' motion is a hodge-podge of contrived interpretations, misrepresentations and inapposite case law.  It should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff Christian Charles ("Charles") 30-year career as an award-winning writer, director and producer, and the history of his 18-year collaboration on various projects with Defendant Jerry Seinfeld ("Seinfeld") – during which it was not uncommon for Seinfeld to claim creative ownership of Charles's ideas – are described in Charles Dec. ¶¶ 2-7. [1]

---

[1]      References are to the following declarations and affidavits submitted on this Opposition: Declaration of Christian Charles ("Charles Dec.");

The genesis of "Comedian" – a feature film documenting Seinfeld's attempt to develop a new stand-up comedy act from scratch – is explained in Charles Dec. ¶9; Streiner Aff. ¶¶3-4.  Creating "Comedian" was a two-year project.  Charles directed; Streiner produced.  Seinfeld played no role in editing and assembling the film.  Charles Dec. ¶10; Streiner Aff. ¶4.  The contract for "Comedian," negotiated through Seinfeld's representatives, divided proceeds 50% to Seinfeld, 25% to Charles and 25% to Streiner, after Seinfeld recouped his costs.  Charles Dec. ¶11.  Although Streiner alone produced "Comedian," for what could only be described as reasons of vanity Seinfeld unilaterally credited himself as producer of the film.  Charles Dec. ¶12.

During the filming of "Comedian" Seinfeld went on a cross country road trip with his friend Barry Marder, in a newly purchased vintage Volkswagen Beetle/bug.  Charles and Streiner met up with Seinfeld and Marder as they returned to New York City, to film their approach for possible use as part of the documentary.  Charles Dec. ¶13; Streiner Aff. ¶5.

But it struck Charles that two comedians driving in a car and exploiting their comedic prowess to weave various conversations into comedy gold was the core of an idea beyond the confines of the documentary.  Charles believed the idea was its own show, and suggested it to Seinfeld.  Charles immediately began to develop his core thought into a structure that could work as a single-minded show idea.  Charles Dec. ¶14.

As Charles worked on completing "Comedian," he continued to share thoughts with Seinfeld about his ideas for this stand-alone show, and he conducted research into then-available video and audio

---

Declaration of Anne Estonilo ("Estonilo Dec.");
Declaration of Leonard Beckerman ("Beckerman Dec.");
Declaration of Peter L. Skolnik ("Skolnik Dec.");
Declaration of Simon Smith ("Smith Dec.");
Affidavit of Gary Streiner ("Streiner Aff.");
Affidavit of Robert Fisher ("Fisher Aff.").

Extrinsic evidence may be considered part of the complaint when the court deems the evidence integral to at least one claim in the pleading.  *See Bank of New York Mellon Trust Co, v. Morgan Stanley Mortg. Capital, Inc.* No 11Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) (on motion to dismiss, Court may consider "documents that the plaintiff either possessed or knew about and relied upon in bringing the suit")  Evidence is "integral" to the pleading when plaintiff has actual notice of the evidence and the complaint "relies heavily upon its terms and effect" in "framing the pleading."  *Chambers v. Time Warner, Inc.* 282 F.3d 147, 152-53 (2d Cir. 2002).  All of the declarations and exhibits submitted consist of evidence plaintiff relied upon in framing the Second Amended Complaint and are integral to it.

technology that with Streiner's help might support his vision.  Charles Dec. ¶15; Streiner Aff. ¶6.

Based on the idea he had been thinking about and researching, Charles worked up a pitch for what he called "'67 BUG" (aka TWO STUPID GUYS IN A STUPID CAR DRIVING TO A STUPID TOWN), and presented it to Seinfeld.  Charles Dec. ¶16; Streiner Aff. ¶7.

Seinfeld declined the '67 Bug pitch, but Charles never let go of the idea and knew it was only a matter of time before technology and content caught up with the concept's unique style, tone and structure. Charles Dec. ¶¶ 17-18.  After the unsuccessful pitch of '67 Bug to Seinfeld, Charles continued to collaborate with him on many projects.  Charles Dec. ¶19.

**During a meeting at a diner, Seinfeld gratefully embraces Charles's concept for CICGC, and the two agree that Charles will now develop the project and prepare for the test shoot that ultimately becomes the Pilot.**

After "The Marriage Ref'" second season was complete, Charles received a call from Seinfeld about getting together to talk.  When they met On July 29, 2011 at The Princess Diner in Southampton, NY, Seinfeld explained to Charles that his representatives George Shapiro and Howard West had told him – for the first time in their relationship – he should return to his roots, creating comedy and shouldn't be trying to franchise "The Marriage Ref'."  "The Marriage Ref'" had not been a success and Seinfeld also confided he was having financial woes.  Charles Dec. ¶¶20-22.

Seinfeld told Charles he wanted help in creating a new show, involving himself and another comedian driving someplace in a car and talking, uninterrupted, during the drive.  Charles immediately reminded Seinfeld this was the '67 Bug idea he had pitched to him in 2002.  Seinfeld in no way disputed this or corrected Charles.  Knowing it was finally a perfect time to re-exploit his idea Charles enthusiastically agreed to develop it for Seinfeld.  At no other point during developing and creating the test/pilot episode of COMEDIANS IN CARS GETTING COFFEE did Seinfeld ever claim he though the idea was his, and when Charles reminded him it wasn't, Seinfeld did not disagree.  Charles Dec. ¶¶ 23-24.

Charles left the meeting proposing that he would put together a treatment that expressed his idea as simply as possible.  Charles did so, and later registered this treatment under U.S. Copyright Reg. No. PA0002055610, a copy of which is attached to the Charles Declaration as **Exhibit A**.  Charles Dec. ¶25-26.

Charles sent his treatment to Seinfeld, and it was used as the basis for all discussions and later interaction with crew. It had the title "Comedians In Cars Going For Coffee." Seinfeld suggested it would be more simply expressed as "Getting," and the title of the show was changed to "Comedians In Cars Getting Coffee" – although "Comedians In Cars Going For Coffee" appears on the majority of the later internal documents based on the treatment, which were the basis of production work on the show. Charles Dec. ¶27.

Following the Princess Diner meeting, Charles saw clearly the potential opportunity he had, and became obsessed with the fine details of how the show would work as a vehicle to re-establish Seinfeld's reputation. He meticulously approached the development of the show with scripts, visual references, and research into equipment; he also focused on music styles, different car selections, guests on the show, and pacing as a vital consideration in how the show could work to its greatest potential. Many documents associated with this phase of Charles's development of the show were filed with the US Copyright office during preparation of the original Complaint to confirm Charles was the creator of the show. Charles Dec. ¶¶28-30.

All the work ultimately led to Seinfeld's increased enthusiasm for the idea and Seinfeld and Charles planned to produce a test shoot. Both agreed to put in money and time, discussed who the first guest would be, and after considering several possibilities, deciding on Barry Marder. Charles Dec. ¶31; *see* Beckerman Dec. ¶3.

As the pre-production of the show developed, Seinfeld asked to be more involved. Charles tried to include him as much as possible, but pre-production went as it normally would with Charles's core team at mouseROAR. Charles completed all the location research and scouting without Seinfeld as he would normally do; and the production team and Charles built out crew, schedules, shot lists, etc. – all as they would normally do on a job – without Seinfeld's participation. Charles Dec. ¶32; Fisher Aff. ¶¶4, 4.1[2]. Seinfeld's minimal involvement in all aspects of creating the Pilot is described in Charles Dec. ¶33; Fisher Aff. ¶4.1.

---

[2] Subparagraphs in the Fisher Affidavit are identitied as, *e.g.,* 4.1, 4.2, etc.

During the actual shoot of the test/Pilot Seinfeld was in a very foul mood.  Despite various problems making for a difficult shoot, Charles shot most elements that were needed for a successful edit.  Charles Dec. ¶¶34-35; Fisher Aff. ¶¶4.2-4.6.

Charles began editing the film alone with his editor in the edit suites of mouseROAR's office.  He realized the need for some additional "pick up shots," and went out twice, to shoot them.  On the second occasion Charles was joined by his producer Bob Fisher to drive back out to the Bendix Diner in New Jersey where they had filmed the coffee portion of the Pilot.  While they were there filming, Seinfeld called Charles, who left the diner to take the call.  Charles Dec. ¶36; Fisher Aff. ¶¶4.8, 4.9.

**Between the Princess Diner meeting and the shoot, Seinfeld made various suggestions to Charles.  But during the shoot, he couldn't wrap his head around what Charles was doing, and backed out of the project, claiming he didn't know what the show was about.**

Seinfeld told Charles he was no longer interested in pursuing the idea.  He didn't think that it worked and said "I don't even know what it is."  Charles mouthed to Fisher "Jerry is out."  Charles Dec. ¶37; Fisher Aff. ¶4.9.  Devastated at Seinfeld's decision to quit, Charles explained he was already well down the path of producing an edit of the show, and was determined to complete it and share the final result with Seinfeld.  After the call, Charles and Fisher returned inside the diner and completed the shots required for the edit to work the way Charles desired.  Charles Dec. ¶38; Fisher Aff. ¶4.9.

**Charles was distressed, but not defeated. He completed shooting and editing the Pilot and sent it off to Seinfeld.**

Charles's work to finish a rough-cut edit of the "Comedians In Cars Getting Coffee" Pilot representing all the potential Charles had seen for the idea back in 2000, and complete excepting certain elements that needed Seinfeld's involvement, such as voiceovers, is described in Charles Dec. ¶39.  Charles emailed it to Seinfeld.  Charles Dec. ¶40.

**Once the rough footage had been assembled into the pilot – solely by Charles, and through his ingenuity and creativity – Seinfeld suddenly understood.**

To Charles's great relief, Seinfeld quickly responded that he was wrong, that the idea did work and have great potential, and he thanked Charles "for persevering."  He told Charles "I really enjoyed the cut," and admitted "I'm starting to see this now."  A copy of Charles's October 16, 2011 email sending the rough cut of the Pilot, and Seinfeld's response, are attached to the Charles Declaration as **Exhibit B**.  Charles Dec. ¶41.

[7]

Seinfeld then involved his representative, George Shapiro, who was equally excited by the rough cut.  The wheels of development then turned quickly.  Charles Dec. ¶42.  Charles's representative, Lenny Beckerman, told Charles that before the show was shopped there should be a deal in place to protect him, incorporating his writing, directing and producing of the show, and clearly indicating Charles's backend and ownership interest in the show.  Charles told Beckerman he and Seinfeld have a handshake deal, which is how they had worked in the past, and told Beckerman he trusted Seinfeld to do the right thing.  Beckerman Dec. ¶4.

Seinfeld asked Charles and Estonilo to propose a strategy for releasing the show while protecting his reputation in the event of another failure like "The Marriage Ref" – a strategy Defendants later used without Charles's and mouseROAR's involvement.  Charles Dec. ¶43.

**Other players enter the picture.**

Shapiro immediately went on the search for both sponsorship from a relevant brand, and distribution through a non-traditional digital distributor because the idea was a non-traditional idea.  It was also agreed that Charles should continue developing the show, and that mouseROAR, under his creative guidance, should be working on research, location scouting, car acquisition and other pre-production details.  All agreed to act quickly, excited about the show's potential.  Charles Dec. ¶¶44-45.

When Charles received an email from Seinfeld's assistant Melissa Gastgaber that Seinfeld wished him to attend a meeting with Seinfeld and "someone from Sony," and learned that the meeting was to be with Michael Davies at a company called Embassy Row, he became concerned. [3]  Despite his misgivings (*see* **Exhibit C** to the Charles Declaration) Charles attended the meeting and took the lead in explaining the creative and structural elements of the show.  Davies was instantly interested and excited by the idea of streaming the show on "Crackle," a burgeoning but somewhat unknown digital platform owned by Sony.  After the meeting Beckerman contacted Davies and Seinfeld's rep, Shapiro, to negotiate Charles's deal.  Both assured Beckerman they would make a deal and "take care of Christian."  Charles Dec. ¶¶46-49; Beckerman Dec. ¶5.

---

[3]  Embassy Row is a boutique production company owned by Sony.  mouseROAR is also a boutique production company, and it had been presumed, as had always been the case with the work that Charles developed with Seinfeld, that mouseROAR would handle all production of "Comedians In Cars Getting Coffee."

Over the coming days Charles and Estonilo, in their mouseROAR capacities, worked more directly with Embassy Row in working out how production of the show would be structured, and made it clear to them that mouseROAR would be the producers, which Embassy Row agreed would be the case.  Estonilo explained to Embassy Row mouseROAR's specifically-created production process and shared the nuances learned about working with Seinfeld.  Charles Dec. ¶50.

There was a pressing need to formalize mouseROAR's involvement in production with Sony. Because Charles had a long-standing relationship with Seinfeld and Shapiro, he reached out directly to Shapiro to start things regarding mouseROAR's production deal.  But all of Charles's negotiations as creator and director of the show would be dealt with on a separate track – by his manager Lenny Beckerman and his agents at William Morris.  Charles Dec. ¶51.

**A schism develops.**

Shapiro told Charles on the phone he had already made Seinfeld's deal, and that mouseROAR was on its own in making a deal with Embassy Row and Sony.  Charles was shocked; this had never been the case in Charles's prior dealings with Shapiro, who had always supported Charles, establishing a precedent and set of assumptions.  Charles believed this project would unfold in the same way.  But now Seinfeld was not supporting Charles's negotiation of participation in the show or mouseROAR's involvement in production.  Charles Dec. ¶¶52-53.

Charles's negotiations as a writer and director are always dealt with separately from mouseROAR through his loan-out company, PBBHHH!!!! LLC, so he contacted Beckerman to discuss how to approach his personal deal as the creator and director of the show.  Beckerman emailed Embassy Row requesting to work out Charles's deal prior to moving forward with the production process and informed all parties that no materials would be surrendered until there was a deal in place for Charles as creator, director, writer and producer for the show.  Beckerman Dec. ¶6; Charles Dec. ¶¶54-55.

**Things begin to fall apart.**

When Seinfeld learned about Charles's demands, he called Charles directly and expressed anger – notwithstanding Charles's personal financial investment – that Charles was attempting to negotiate his creative contribution and a backend deal.  Although he did not dispute that Charles had created and developed the Pilot, he expressed outrage that Charles would receive anything other than a fee for directing

[9]

each individual episode.  The call ended with Seinfeld yelling at Charles, calling him "ungrateful" and "out of line," and left Charles feeling he had been set up to hijack the entire project.  Charles Dec. ¶¶56-57.

Charles asked everyone to hold off any discussions while he tried to get his head around the unfortunate unfolding of events.  After a few days Charles realized that he should simply attempt to talk to Seinfeld again.  He emailed Seinfeld, requesting a talk.  During the second call it became very clear to Charles that Seinfeld had decided that although he didn't dispute Charles's creation and authorship, he was unwilling to compensate Charles for it, coming up with various specious reasons.  *See* Beckerman Dec. ¶7.  He also gave Charles a long speech about how Julia Louis-Dreyfus had done a similar thing to him when he negotiated bonuses for the cast of the show "Seinfeld" and Louis-Dreyfus had her reps call Seinfeld to negotiate a bigger bonus.  Charles told Seinfeld they would have to "agree to disagree."  The call once again ended with Seinfeld yelling, telling Charles he should be so lucky as to receive a director's fee.  He gave Charles no chance to respond, and hung up.  Charles Dec. ¶58.

Never during either of Charles's phone conversations with Seinfeld or during production or post production of the show COMEDIANS IN CARS GETTING COFFEE did Seinfeld ever claim any ownership or origination of the idea.  Charles Dec. ¶59.

Seinfeld's unreasonableness and lack of respect and appreciation were not new phenomena.  At no point during their long working relationship had Seinfeld ever publicly acknowledged to anyone Charles's role in the work Charles had created for him.  Charles Dec. ¶60.  Angry, sad and confused about how things had deteriorated so badly, Charles contacted Carolyn Liebling, Seinfeld's older sister, with whom he had a long-standing relationship, both professionally and personally.  Carolyn expressed deep disappointment that things had gotten to this point with her brother.  She conveyed that his behavior was inappropriate and, as she had told Charles in the past, when Seinfeld gets stuck on something, there's no reasoning with him.  Carolyn assured Charles that everything would blow over, and that Seinfeld would eventually come to his senses; that their relationship was too strong for this disagreement to be permanent.  Carolyn also confided that Seinfeld's wife Jessica agreed with her that Seinfeld was being unreasonable.  At about the same time, Estonilo received a call from George Shapiro, who also assured her that Charles's relationship with Seinfeld was far from over.  Charles Dec. ¶61, 63.

[10]

Buoyed by Liebling's and Shapiro's calls, Charles again asked Beckerman to suspend discussions with Embassy Row and Shapiro West to allow the dust to settle. All of the negotiations were left in limbo. With the continued hope of reconciliation, mouseROAR, which had moved forward in good faith with development and pre-production of new episodes beyond the test/Pilot, wrapped up loose-end costs with Carolyn Liebling – including outstanding costs from the original production of the Pilot; Liebling had earlier stated a desire to assist Estonilo with those so that mouseROAR wasn't continuing to bear the brunt of too many of the production costs. Charles Dec. ¶¶62-63.

**While Estonilo and Liebling deal with mouseROAR's reimbursement for _production_ expenses, Charles's representatives – with Liebling's knowledge – had been engaging in now-suspended discussions with Embassy Row about Charles's deal and backend compensation as CICGC's creator/director.**

mouseROAR's production activity on the test/Pilot in Fall 2011 and Winter 2012 with no creative direction or materials from Seinfeld or his team, and Estonilo's personal witnessing of Charles's creation of the 2011 treatment, its various drafts, creative materials and shot lists, scripts etc., are explained in Estonilo Dec. ¶¶6-7. The Call Sheets for the October 5-6, 2011 Pilot shoots, on which Seinfeld appears only as "talent," were shared with Seinfeld and his office. *See* Estonilo Dec. ¶¶8-9 and **Exhibit A**.[4]

Because CICGC was initially only to be a test shoot, the Pilot was shot and produced without Estonilo's typical deal paperwork; she anticipated that mouseROAR's and, more important, Charles's deal memos would be negotiated later should the project be greenlit. Estonilo Dec. ¶¶12-13.

Charles always negotiated his deals separately under PBBHHH!!!! LLC, his loan out company. Estonilo did not represent Charles/PBBHHH!!!! in negotiations. Nor did she have authority to grant, license or waive Charles's creative rights, his backend participation or ownership. Estonilo Dec. ¶¶14-16.[5]

---

[4]     After working with Charles on several Seinfeld projects, Estonilo had grown increasingly uncomfortable around Seinfeld himself. She found his demeanor and tone to be degrading, and unlike many other celebrities and important personalities, he lacked humility and grace. Estonilo preferred to work elsewhere or off Set when he was around, so Charles hired his longtime colleague Bob Fisher, an experienced and savvy producer, to work on CICGC and to be physically on Set. Estonilo Dec. ¶¶10-11. *See* Fisher Aff. ¶4.

[5]     mouseROAR did not and does not have a work-for-hire agreement with Charles or his company PBBHHH!!!!. Charles is an independent contractor to mouseROAR, which is a signatory to the Director's Guild of America.

[11]

Liebling knew that payments for Charles's work as a creative consultant/writer had always been made to his loan-out company PBBHHH!!!!.  Estonilo Dec. ¶¶17-19.

The invented narrative Defendants have constructed about the significance and actual intent of Estonilo's discussions with Liebling about payments relating to "Comedians In Cars Getting Coffee" – reflected in the email exchange attached as Exhibit C to the Snyder Declaration – is wholly false.  Estonilo intended to request payment of outstanding bills, well over 60 days in arrears, outlined in the P&L she attached to the April 11, 2012 email, which is not included in Snyder's exhibits.  The P&L is annexed as **Exhibit B** to the Estonilo Declaration.  Estonilo Dec. ¶¶20-21.

Estonilo believed, as Charles did, there was still an opportunity for mouseROAR and Charles to be engaged in the series.  She had the impression from Liebling that Shapiro was trying to reason with Seinfeld.  Liebling had written in response to Estonilo's request, "George and I spoke on the phone.  He will speak with Jerry".  Estonilo Dec. ¶22.  Estonilo never spoke to Seinfeld himself about terms or invoices or payments.  Seinfeld's team of managers, agents and attorneys always handled contracts with Estonilo, including the negotiation of mouseROAR's production service agreements on projects with Seinfeld's relationships such as DreamWorks Animation, and Australia's Greater Building Society among others.  To the best of Estonilo's knowledge, Liebling was never part of that legal process.  She and Estonilo never interacted when legal experts were involved.  Estonilo continued to anticipate and rely on being sent formal contracts from Sony and Embassy Row for mouseROAR's *production services*, knowing, as did Liebling, that Charles's reps were attending to *his* rights.  Estonilo Dec. ¶¶23-26.

On the afternoon of January 31, 2012, Estonilo explained to Beckerman he should be sure a production-services agreement for mouseROAR was put in place before they continued prepping additional episodes and sharing budgets and other materials with Embassy Row.  Estonilo's emails with Beckerman are attached to her Declaration as **Exhibit C**.  The same day, Estonilo made the same point to Liebling, and forwarded a copy of Beckerman's email to Embassy Row's Michael Davies, insisting on receiving "a deal or confirmed understanding" of Charles's and mouseROAR's position in the series, and "a sense of their backend and Involvement."  Liebling expressed her relief that "Lenny is on this."  Estonilo's January 31 emails with Liebling are attached to her Declaration as **Exhibit D**.  Estonilo Dec. ¶¶27-28.

[12]

Estonilo did not believe or intend her emails with Liebling to be a replacement for formal contracts or legally binding agreements. Liebling and Estonilo did not handle contracts with each other; they dealt with expenses, and at times shared project information to assist each other's roles in accounts payable. Estonilo Dec. ¶¶29-31. Estonilo feared Seinfeld intended to leave her company with a crippling and undue financial burden. The fundamental intent in her April 2012 calls with Liebling, reflected in her emails, was to inform Liebling of outstanding amounts for several months of significant expenses mouseROAR had incurred at Seinfeld's request to prep for shooting 5-6 additional episodes, among other requests. Liebling suggested that Estonilo send an invoice. When Liebling paid that invoice Estonilo neither considered nor intended receipt or deposit of that payment to constitute a release of ownership, rights or clearance of the material – none of which Estonilo was authorized to release.[6] As Estonilo's April 11, 2012 email to Carolyn explains (see Snyder Declaration, Exhibit C), with respect to Charles, the P&L reflected in the invoice covered only Charles's substantially-discounted salaried rate as an independent contractor director. It had nothing to do with his creation and authorship of the Pilot, which both Estonilo and Liebling knew were being negotiated separately by Charles's representatives. Neither Estonilo nor mouseROAR has ever managed ownership of Charles's contributions to CICGC. Estonilo Dec. ¶¶32-34.

When Estonilo re-read the emails of April 2012, she recognized she had been misled, and was operating on assumptions based on incorrect information and false assurances made by George Shapiro on the state of the project. The history and content of those false assurances, and Estonilo's actions in reliance upon them, is set forth in Estonilo Dec. ¶¶35-37. In retrospect, Estonilo believes Shapiro intended to deceive her. Further, the characterization of Estonilo's emails with Liebling as a waiver, as replacements for a formal contract, or as transferring ownership, is so wholly inconsistent with Seinfeld's long-established procedures with Charles and mouseROAR that it has the stench of a blatant fraud.
**Still optimistic because of assurances from Liebling and Shapiro, Charles continues to hope that the situation can be resolved, but is uncertain how to proceed.**

For the weeks and months after his second conversation with Seinfeld, things became increasingly difficult for Charles. He wrestled with anger and frustration with Seinfeld's behavior but held out hope that

---

[6]     Liebling almost certainly understood this as well. Her son Josh worked in the mouseROAR office at the time, where they were working hard to keep projects going, made difficult by the unpaid months of development and prep for additional episodes of CICGC.

[13]

Seinfeld would "calm down," come to his senses, and their eighteen-year working relationship would continue. But mouseROAR, expecting there would be appropriate compensation and production work at the end of its development, was in trouble financially. Charles focused on restoring mouseROAR to profitability, but there was continuing silence from the Seinfeld camp while Charles waited, unaware of when the series was released to the public. Charles Dec. ¶64-65.

Once Charles realized that episodes were streaming online, the idea of viewing them was very painful. But he eventually watched enough of what had been released to realize that Seinfeld had, in no way, moved the concept forward. The template, structure, visual style, pacing, tonal approach, musical integration … everything, was a direct lift from Charles's work. Charles Dec. ¶65.[7]

Eventually, Charles contacted Seinfeld with a polite compliment, hoping to restart a dialog allowing him to become re-involved with the show he had created, which he believed was being mismanaged. In June 2014, Charles attempted again to reach out at a personal level in order to reconnect. He emailed Seinfeld suggesting that perhaps it was time to put aside whatever differences they had. Seinfeld responded: "Sure." Charles Dec. ¶¶66-67.

Charles, who did not seek any media on the show due to the pain it inflicted, was unaware of what Seinfeld was claiming in the press and in interviews. Only later did Charles learn that Seinfeld had floated many different stories about how he had initially come up with the idea. It is, of course, legion, for celebrities to exaggerate their accomplishments to the press, and Charles knew from his extensive prior experience with Seinfeld that Seinfeld often would claim credit for the work of others – including Charles's. He took Seinfeld's claims as mere puffery, relying on the fact that Seinfeld had never once disputed Charles's role and never once asserted *to Charles* that the original idea was Seinfeld's. Charles's own simultaneous public assertions of creation and authorship are detailed in Charles Dec. ¶68.

By 2016, Estonilo and Beckerman began suggesting that Charles challenge Seinfeld legally about his authorship/ownership interest in the show. But for various reasons relating to placement of CICGC on the fledgling "Crackle" digital network, Charles realized there was little to be gained by an expensive lawsuit against well-heeled adversaries. Charles Dec. ¶69. That assumption was confirmed to Charles by

---

[7]      Based on knowledge gained during years of working with Charles, the Fisher Affidavit describes these hallmarks of Charles's visual style at ¶¶ 4.8, 4.11. *See also* Streiner Aff. ¶8.

Simon Smith, a mutual work associate and friend of both Charles and Seinfeld, who reported to Charles and Estonilo a conversation with Seinfeld in which Seinfeld claimed there was no money in CICGC. Charles Dec. ¶70.  See Smith Dec. ¶¶2-7.  Charles was also reluctant to confront Seinfeld about credits on the show.  Credits are important currency in the entertainment industry.  In a highly selfish and unusual move, Seinfeld had arranged that episodes of CICGC would carry no screen credits, so even if Charles won a right to a "created and directed by" credit for the show, it wouldn't be visible.  Charles Dec. ¶70.

**Charles realizes he can no longer wait for Seinfeld to do the right thing.**

Later in 2016 Estonilo heard rumblings that Seinfeld was planning on moving the show to Netflix. Charles understood that if the show was finally fulfilling its financial potential, he had to do something about the theft of his original work.  When Seinfeld made a very public deal with Netflix to take over the production and distribution of the show, announced to be for $100,000,000, Charles and Estonilo began to reach out to attorneys to see if they could get support for filing a complaint against Seinfeld, Embassy Row and Sony.  Charles also filed a copyright application for the original treatment he had created for the show, then entitled "Comedians In Cars *Going For* Coffee."  The Copyright Office, apparently realizing that a previous registration had been filed by Defendants under the title "Comedians In Cars *Getting* Coffee" – a registration about which Charles was unaware – inserted a line into the registration certificate *sua sponte*, listing "Comedians In Cars Getting Coffee" as a "previous or alternate title."  Charles had nothing to do with that decision.  Charles Dec. ¶¶71-72.

Due to the David/Goliath character of litigating against Seinfeld, Sony and Netflix, Charles had difficulty finding legal counsel.  He decided the only practical way he could claim his authorship/ownership interest would be to do it himself directly to Seinfeld.  Other than in the self-aggrandizing media puffery claiming CICGC was his idea, Seinfeld had never denied either Charles's origination of the idea or his authorship of the pilot.  In December 2017, certain that Seinfeld knew the truth and would acknowledge it now that the show Charles had created for him was finally reaping huge rewards, Charles wrote to Seinfeld asking to discuss a mutual way forward based upon Seinfeld acknowledging Charles's rights.  A copy of Charles's letter to Seinfeld is annexed to his Declaration as **Exhibit D**.  Charles Dec. ¶¶73-74.

Rather than responding himself, Charles received a letter from Seinfeld's long-time attorney Jay Cooper – attached to Snyder's Declaration as Exhibit D.  Cooper declared to Charles for the first time that

Seinfeld was the originator of the concept.  Never before had Seinfeld questioned Charles's claim of originating the concept.  More astonishingly, Cooper claimed to have "documentation" showing that Seinfeld had "registered" the show's concept prior to the 2011 meeting at the Princess Diner.  The purported "documentation" was not attached to Cooper's letter; nor has it been submitted to the Court on this motion. Charles Dec. ¶75.

Charles responded to Cooper's letter on January 19, 2018.  Charitably believing Cooper was misinformed rather than engaging in a brazen lie, Charles urged him to discuss the facts with Seinfeld.  He explained some of the underlying history of his creation of CICGC, including that he had presented the concept to Seinfeld several years *before* 2011.  He also explained that mouseROAR's recoupment of production expenses was not a waiver of his rights or claims to the show.  A copy of Charles's January 19, 2018 letter to Cooper is attached to his Declaration as **Exhibit E**.  There was no response from either Cooper or Seinfeld.  This repudiation and apparent fabrication on Seinfeld's behalf provoked Charles to file an initial pro se Complaint in this Court on February 9th, 2018.  Charles Dec. ¶¶76-77.

## LEGAL STANDARD

Other than as explained in note 1, *supra*, Charles accepts Defendants' recitation of the legal standard on a motion to dismiss.

## ARGUMENT
### POINT I
### SOME OF DEFENDANTS' ARGUMENTS FOR DISMISSAL – SPECULATIVE AND MISINFORMED – ARE SIMPLY SPURIOUS; DISCOVERY IS NECESSARY TO DETERMINE THE TRUTH

Defendants seek dismissal. But their rickety, ambiguous evidence and the interpretations and conclusions they draw from it point — repeatedly and inexorably — in a different direction: discovery.

For Seinfeld to have authority to repudiate Charles's claims to an authorship and ownership interest in the Pilot , he must himself be its author or owner. The SAC asserts that Charles is (at the very least) an author and owner of the Pilot. With evidence presented here he has both substantiated those claims, and explained why Seinfeld should be found to be neither the Pilot's author nor its owner.  Discovery is required to determine whether Seinfeld is either. If he is not, then he is a stranger to the copyrighted work and the express repudiations upon which he seeks to rely to refute joint authorship are legal nullities.

[16]

Stated another way, if discovery proves Charles is an author and owner of the Pilot and that Seinfeld is neither, then Seinfeld and the other Defendants never had — and still do not have — any more right to deny Charles's interests than the man in the moon.

Certain of Defendants' arguments are based on pure speculation, misunderstanding or misrepresentation. They should be rejected and disposed of quickly, so discovery can explore the actual facts.

**Charles did not release his claims.**

- Defendants argue that Charles "released all claims related to the show" and that after April 2012, "he never had the expectation of continued involvement in the Show." Defendants' Memorandum ("Def. Mem"), at 22-23 (emphasis in original). Put aside Charles's and Estonilo's continuing belief – fostered by Liebling, Shapiro and others – that Seinfeld would eventually acknowledge Charles's authorship and ownership (Second Amended Complaint ("SEC") ¶86; Estonilo Dec. ¶22), Charles's attempt to re-engage with Seinfeld in June 2014 (SAC ¶87), his September 2016 copyright registration (SAC ¶92 and Exhibit A), and his December 2017 letter to Seinfeld (SAC ¶97). Estonilo's submission to Liebling on behalf of mouseROAR to recoup mouseROAR expenses – an invoice that Liebling requested – and Estonilo's acceptance of the long-overdue payment for mouseROAR's production services, constituted no release, waiver, relinquishment or abandonment of Charles's authorship/ownership interests and rights as a creator of CICGC. As Liebling knew, those were being separately negotiated on Charles's behalf among Beckerman, Shapiro and Davis, and Estonilo had no authority to dispose of them. Estonilo Dec. ¶¶14-37 and **Exhibits B, C and D**; Beckerman Dec. ¶¶5-6. The payment Estonilo requested and received for Charles, reflected in the P&L submitted with the invoice, covered "only his substantially-discounted salaried rate as an independent contractor director for mouseROAR. It had nothing to do with his creation and authorship of the Pilot." Estonilo Dec. ¶33.

**The only fraud on the Copyright Office was committed by Defendants.**

- Charles's copyright registrations are in no way fraudulent. His first registration – of his Treatment for CICGC bearing the title "Comedians In Cars Going For Coffee" – was filed without knowledge of Defendants' earlier registration. Charles Dec. ¶ 71-72. The Copyright Office added

[17]

the alternate title "Comedians In Cars Getting Coffee" on its own initiative. Id.; Charles Dec. **Exhibit A.** Estonilo witnessed Charles's 2011 creation of the Treatment (Estonilo Dec. ¶7). As to when it was created, the Treatment had been sent to Seinfeld by Charles upon its 2011 creation, and was used in their subsequent discussions and by the production crew during their work on the Pilot. Charles Dec. ¶27. Defendants' assertion that Charles defrauded the Copyright Office by claiming sole authorship of the Treatment is bizarre. Do they suggest someone else wrote the Treatment that Seinfeld approved and the crew followed?

- Defendants' arguments that Charles's registration of the CICGC Pilot and script are fraudulent because untimely are simply silly. [8]  Evidence that the Pilot was shot in October 2011 and completed soon thereafter is overwhelming. Defendants' assertion that the Second Amended Complaint should be dismissed because it was fraudulent for Charles to claim sole authorship is nonsense, since authorship – whether sole or joint – is the very issue at the heart of this litigation. The Second Amended Complaint asserts both sole and joint authorship. On a motion to dismiss, Charles's explicit claims to be the sole or joint author of CICGC must be accepted as true, and are substantiated at length and in detail in his Declaration. Only discovery can determine the facts of the authorship dispute.

**Although Defendants identify no copyrightable contribution by Seinfeld, Charles's extensive contributions are certain and well-defined.**

- Defendants' argument that Charles failed to allege a protectible copyright interest (Def. Mem. at 18-20) is both mistaken and ironic. The argument is based on an assertion – strange for an

---

[8]     The true fraud on the Copyright Office was committed not by Charles, but by Defendants. Defendants never registered copyright in the CICGC Pilot. In Defendants' copyright registration, the episode for which they claim protection isn't the Pilot – (*See* Snyder Declaration, Exhibit B) – it's one called "Larry David Eats A Pancake," claiming four years after its creation that it's "author" was SONY, who assigned its copyright to Seinfeld's "Comedians in Cars, LLC." What sheer nonsense!

While "Larry David" might have been the first episode streamed on SONY's Crackle platform, while it might have been created as a work-for-hire for SONY and might have been assigned to Comedians in Cars LLC, it was decidedly not CICGC's Pilot episode (and indeed claims only to be an "episode"). The Barry Marder episode, the first episode conceived and created – and by all standard industry measures, practices and definitions the show's actual "pilot" – was simply relocated by Defendants within CICGC's first Crackle season as Episode 7, and it continues to stream on Netflix to this day, now found as Episode 16 in CICGC season 3. *See* Skolnik Dec. **Exhibit C.** The "Larry David" Episode, like all other Episodes of CICGC, is a derivative work based on the Barry Marder Pilot Charles created and registered.

alleged owner of valuable copyrights – that "the Show's concept is generic and stock, that it belongs to the world, and that it is not subject to copyright protection." Def. Mem. at 20.[9]  But no sooner do Defendants climb out on this limb than they scramble to install a footnote safety net, mumbling "Of course, Mr. Seinfeld's copyrights for each episode of the Show are protected, even if the Show was found to be "a compilation of unprotectible elements" (*id*., n. 14), citing the wholly distinguishable *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996 (2d Cir. 1995).

•      In *Knitwaves*, the Court was applying the "substantial similarity" test to evaluate infringement, which it identified as an examination of the works' "total concept and feel," citing *Eden Toys, Inc. v. Marshall Field & Co*., 675 F.2d 498, 500 (2d Cir.1982).  After noting that the well-known *Feist* telephone directory case (*Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)) had established that even "a compilation of unprotectible elements" can be copyrightable, the *Knitwaves* Court explained that "[w]hat is protectible then is 'the author's original contributions' –the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." *Knitwaves*, 71 F.3d at 1004 (citations omitted).  That all episodes of CICGC have an immediately identifiable "look and feel" is due directly to the recognizable template Charles created for the show and embodied in the Pilot. Various reviewers have commented on this reality.  *See* Skolnik Dec. **Exhibit A** (August 3, 2012 *New York Times* review), which notes:

o      quite a bit of thought and care has been given to how [the show] looks.  The videos . . . are presented in a clean, elegant template. . . .And the filming and editing are, if you break them down, impressively complex and artful for a web series.  Multiple cameras, including three mounted inside the cars, are used simultaneously to render the free-flowing conversations seamlessly, without the staccato cuts that have become the norm in a new generation of new-school chat shows. *See* Skolnik Dec. **Exhibit B** (July 19, 2018 *New Yorker* review), noting "the fundamental structure abides."  The show's "clean, elegant template" and "fundamental structure" were created by Charles, infuse his Pilot, and parent each of CICGC's derivative children.

•      While it is unclear what selection, coordination and arrangement Defendants applied to *their*

---

[9]      Defendants contend (Def. Mem. at 24) that Charles "concedes that the Show's concept, with the Pilot featuring Mr. Seinfeld driving in a small car with Mr. Marder, is a mere variation on filming Mr. Seinfeld and Mr. Marder's September 2000 'return to New York City from a cross-country drive . . . in Seinfeld's newly-purchased vintage Volkswagen Beetle' for the Comedian documentary."   For this contrived distortion of the SAC Defendants cite SAC ¶¶ 22, 23, 28, which concede nothing of the sort.

episodes of CICGC – other than those copied from Charles's Pilot – it is precisely Charles's selection, coordination and arrangement of the Pilot's elements that provide the Pilot's "total concept and feel" and that constitute Charles's protectable copyright interest. *Cf. Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir. 1970) (examining "total concept and feel" of greeting cards).

- Defendants contrast *Knitwaves* to *16 Casa Duse, LLC v. Merkin,* 791 F.3d 247 (2d Cir. 2015), reading the case myopically to insist that as a director, Charles's "contribution to an integrated 'work of authorship' such as a film is not itself a 'work of authorship' subject to its own copyright protection." *16 Casa Duse*, 791 F.3d at 259. But the Court explained it was not suggesting "that motion picture directors . . . may never achieve copyright protection for their creative efforts. The director of a film may, of course, be the sole or joint author of that film, such that she or he can secure copyright protection for the work." *16 Casa Duse*, 791 F.3d at 258. Here, the entire Pilot was developed, structured, produced, filmed and edited by Charles. *See generally* Charles and Estonilo Declarations, Streiner and Fisher Affidavits. Seinfeld *acted*. He was "talent" during the filming, nothing more. *See* Estonilo Dec. ¶9 and **Exhibit A**.

- While Charles's entitlement to copyright as author of the Pilot is clear-cut, Seinfeld's is far from evident. *Casa Duse* considered the copyrightability of an actor's performance in a film, and agreed with an *en banc* panel of the Ninth Circuit in rejecting an actor's performance as deserving of independent copyright protection. *Casa Duse,* 791 F.3d at 258*, citing Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir.2015) ("*Garcia* (*en banc*)"). The Court agreed with *Garcia's* conclusion that "the actor's 'theory of copyright law would result in [a] legal morass[,] ... [making] Swiss cheese of copyrights.'" *Id.* Here, Seinfeld's performance in the Pilot is no more deserving of independent copyright protection than is Barry Marder's. As the Copyright Office has explained, if a performer "lacks a work-for-hire agreement but . . . 'intend[s] her contribution or performance to be merged into inseparable or interdependent parts of a unitary whole," the performance may qualify for joint-authorship status. Nor can Seinfeld refute joint authorship by claiming he did not intend his contribution – whatever if might have been – to be "merged" into an "inseparable or interdependent" part of the Pilot as a "unitary whole." 17 U.S.C. §101. *See Casa Duse,* 791 F.3d at 257-58: "Motion

pictures . . . are works that may be expected to contain contributions from multiple individuals. *See Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.,* 531 F.3d 962, 975 (9th Cir.2008) ('A motion picture is a work to which many contribute; however, those contributions ultimately merge to create a unitary whole….')  Seinfeld can seek to establish *his* entitlement to joint authorship, but discovery will be required for him to do so.

## POINT II

### THIS CASE IS UNQUESTIONABLY ABOUT AUTHORSHIP SINCE ONLY AN AUTHOR CAN BE AN OWNER, AND BOTH THE INFRINGEMENT CLAIM AND THE JOINT AUTHORSHIP CLAIM ARE TIMELY

In every case upon which Defendants statute of limitations arguments rely – for both infringement and joint authorship – there was no question as to the *defendant's* status as author and/or owner.  All that was at issue was the *plaintiff's* status.  Here, this action cannot be adjudicated, much less terminated, until discovery determines whether Seinfeld was the Pilot's author, its joint author, or neither.  If Seinfeld was not an author, he had no rights or entitlements to repudiate Charles's authorship/ownership rights.

Defendants twist themselves into pretzels trying to show that Charles's claims are grounded in ownership, apparently recognizing that their statute of limitations arguments only have any hope of success if applied to an ownership claim.  Since ownership of copyright "vests initially in the author or authors of the work" (17 U.S.C. §201 (a)), and Seinfeld neither alone "authored" the Pilot nor acquired any of Charles's rights to it as a work made for hire, Defendants' insistence that "Comedians In Cars, LLC" owns the entire copyright to CICGC is a groundless assertion.  For the Pilot to have a copyright, it must have "an author or authors."  Charles has claimed authorship of the Pilot and has delineated and substantiated his copyrightable contributions.  Seinfeld identifies no copyrightable contribution to the Pilot.  If through discovery Seinfeld can prove any copyrightable contribution, it makes him at best a joint author.

Given how vociferously Defendants insist that "ownership is the dispositive issue," it is amazing how often their memorandum loses track of its own rhetoric and cites Charles's assertions of *authorship*, or *authorship*/ownership, in the SAC.  In the most revealing instance of Defendants' own disbelief in the merits of their "it's all about ownership" refrain they contend "[a]s Plaintiff admits, Mr. Seinfeld has a 'competing claim of *authorship*.'  SAC ¶ 121.  Plaintiff's claims are *therefore* 'rooted in [his] contested assertion of an *ownership* interest in the copyright' of the Show."  Def. Mem. at 12 (emphasis added).  It is

[21]

difficult to imagine a more perfect *non-sequitur*.  Other acknowledgments that the SAC asserts sole or joint authorship appear at Def. Mem. at 2, 11.  What part of "*author*/owner" don't defendants understand?  The term "author/owner" signifies Charles's claim to an ownership interest in the copyright to CICGC simply *because* of his authorship of the Pilot – from which all other CICGC episodes derive.  The SAC unquestionably asserts sufficient facts regarding Charles's *authorship*, "accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  There would be no reasonable basis on this motion for the Court to either deny Charles's assertions of a sole or joint authorship interest or to accept Defendants' entreaty that "ownership is the dispositive issue" where Seinfeld's entitlement to any authorship interest has yet to be determined.

### A.    The Joint Authorship Claim Is Not Time-Barred.

As Defendants apparently concede, only an "express repudiation" of a joint authorship claim triggers copyright's three-year limitations period.  *See* Def. Mem. at 12.  Defendants then make a muddle of their statute of limitations defenses by intermingling cases addressing infringement with those about joint authorship.  But putting aside the preliminary question of whether Seinfeld was an author or owner of the Pilot entitling him to repudiate either of Charles's distinct claims, discovery is necessary here to determine whether any conduct or act by Seinfeld satisfies the requirements of an express repudiation.  That is a factual determination to be made by the jury.  See the comprehensive analysis of express repudiation in *Brownstein v. Lindsay*, 742 F.3d 55 (3d Cir. 2014), and its conclusion that the issues of whether the various sources asserted there as constituting express repudiations "were inappropriately decided under Rule 50(a) and should have gone to the jury" *Brownstein*, 742 F. 3d at 75.  Issues "inappropriately decided under Rule 50(a)" should not, *a fortiori*, be decided on a Rule 12(b)(6) motion to dismiss.

*Brownstein* also explains "For repudiation to be express, it must be plain. A copyright holder should not be required to investigate every whisper and rumor that another has declared himself the author of his copyrighted work. A whisper or rumor also does not stir up the type of "storm warning" that would put an author on inquiry notice. It follows that, if an action is not hostile to an author's rights, it may not be plain that his authorship rights have been repudiated." *Brownstein*, 742 F. 3d at 75 (citations omitted).

Each of the "express repudiations" asserted by Defendants is supported solely by citation to cases about *ownership*. In each case Defendants cite, the defendant's authorship or ownership and entitlement to repudiate plaintiff's claims, were, unlike here, not in dispute. In none of those cases was it necessary to determine the defendant's authorship status. Because that is so, Charles need not burden the Court with a dissection of each of Defendants' inapposite cases.[10] Here, only discovery will permit determination of the authorship and ownership rights in the Pilot – both Charles's and Seinfeld's.

Defendants' first purported express repudiations, which they characterize as "pre-production repudiations" – although the Pilot had for all intents and purposes already been "produced" – were two phone calls during which Seinfeld berated Charles for "ingratitude" and "overreaching." Defendants insist "Plaintiff never alleges (because he cannot)" that after those conversations "Mr. Seinfeld ever gave Plaintiff even the slightest impression that he would reconsider his position on Plaintiff's involvement in the Show." Def. Mem. at 13. But such "impressions" – considerably more than "slight," were given to Charles and Estonilo by Shapiro and Liebling (who confided that Seinfeld's wife agreed), that Seinfeld would eventually come to his senses, that he was being "unreasonable," that Shapiro was trying to reason with Seinfeld, and that the relationship on CICGC was "far from over." Charles Dec. ¶61; Estonilo Dec. ¶¶22, 36. Under the circumstances, it cannot be determined on this motion whether Seinfeld's invective – even if he was an author or owner – constituted express repudiations.

Defendants next assert "there can be no clearer repudiation of Plaintiff's copyright *ownership* when 'Defendants *without authorization* copied . . . the entire Pilot by streaming it to viewers as Season One, Episode Seven of the Infringing Show.'" Def. Mem. at 13-14 (emphasis added). If *discovery* reveals that Charles and Seinfeld are joint authors, Seinfeld did not require Charles's authorization to stream the Pilot. "[J]oint authors . . . have no right to interfere with a co-author's use of the copyrighted work. . . . Joint

---

[10]     Nevertheless, because of Defendants' dogged insistence that this case is controlled by *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011), a brief refutation is necessary. *Kwan* was – as Defendants acknowledge – an *ownership* case (*see* Def. Mem. at 3, quoting *Kwan* 634 F.3d at 230: "Where, as here, the ownership claim is time-barred, *and ownership is the dispositive issue*, any attendant infringement claims must fail") (emphasis added)). *Kwan* involved the attempt by a book *editor* to assert a copyright interest in the work of the *undisputed author* of the book she had been retained to edit. Here, there is no basis to find the slightest similarity of status between either Charles and *Kwan's* plaintiff-editor; or Seinfeld and *Kwan's* defendant-author.

authorship entitles the co-authors to equal undivided interests in the work." *Casa Duse,* 791 F. 3d at 259 (citations omitted). Whether Charles and Seinfeld are joint authors – whether Seinfeld may have that status – awaits discovery.

Nor does the lack of royalty payments permit a determination at the 12(b)(6) stage that it constitutes a repudiation. Def. Mem. at 14-15. Charles reasonably believed that Crackle's streaming wasn't generating income for Seinfeld; that it was intended instead merely to keep Seinfeld's name before the public; that SONY's money was being attributed to production costs of derivative episodes in hope and expectation – realistic, given the ultimate Netflix deal – that financial reward would come later. Charles's belief there wasn't yet money in CICGC was confirmed when in 2016, Smith reported on Seinfeld's contention that "there wasn't any money in COMEDIANS IN CARS GETTING COFFEE." Charles Dec. ¶70.

Finally, Defendants propose that Seinfeld's self-aggrandizing media puffery signaled a repudiation of Charles's claims. Charles remained unaware of Seinfeld's media embellishments and hyperboles when they appeared. He knew that Seinfeld had never claimed to *him* that the idea for CICGC was his own, and that Seinfeld often took creative credit with no factual basis. Moreover, Charles openly claimed that *he* had created CICGC. Charles Dec. ¶68. Only a jury can decide whether Seinfeld overstated his actual role; only discovery can establish when Charles learned of Seinfeld's overblown claims and only discovery can expose Seinfeld's actual role. Charles, who knew the truth, was well within his rights to ignore Seinfeld's self-glorification – when he eventually learned of it – as merely an insulting irritant.

**B.     The Infringement Claim Is Not Time-Barred.**

In opposing Charles's infringement claim, Defendants charge he has "frivolously include[d] a reference to the "separate-accrual rule" . . . to attempt to recast the claim as one for an ongoing infringement. Def. Mem. at 11. Defendants misunderstand. The gravamen of Charles's infringement claim is not a single "ongoing" infringement – although infringement of the Pilot is indeed ongoing (see Skolnik Dec. **Exhibit C**). If discovery establishes Charles is the *sole* author, he claims *successive* infringements of the Pilot – by each derivative work Defendants' have released as a new episode of CICGC. Under the "separate accrual rule," each episode constitutes a spanking-new infringement, triggering its own 3-year statute of limitations. *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 134 S.Ct. 1962, 1969 (2014), 188 L.Ed.2d 979 ("Under [the separate-accrual] rule, when a defendant commits successive violations, the statute of limitations runs

[24]

separately from each violation.  Each time an infringing work is reproduced or distributed, the infringer commits a new wrong.  Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs.  In short, each infringing act starts a new limitations period.  *See Stone v. Williams,* 970 F.2d 1043, 1049 (C.A.2 1992)

Damages on Charles's infringement claim – which is asserted against all Defendants – will flow from Defendants' successive infringements, each of which carries its own 3-year "look-back" limitations period.  *See Petrella,* 134 S.Ct. at 1968.  That calculation will require discovery into each Defendant's profits "attributable to [each successive] infringement" beginning three years prior to February 9, 2018.  17 U.S.C. §504.[11]

**POINT III**
**THE STATE LAW CLAIMS SHOULD SURVIVE A MOTION TO DISMISS**

Charles's claims for Breach of Implied In Fact Contract, *Quantum Meruit* and Fraudulent Misrepresentation each carry a 6-year statute of limitations under New York Law.  CPLR 213(2), CPLR 213(8).  Under the facts at bar, these claims are qualitatively different than Charles's copyright claims and are not preempted.  Defendants' citations to SAC ¶¶ 136, 145, 168 misrepresent their import.  Def. Mem. at 23-24.

Discovery must determine both whether various representations made to Charles – *e.g.*, by Seinfeld, by Shapiro, by Davies – created an implied in fact contract or constituted a fraudulent misrepresentation; and whether Charles is entitled to *quantum meruit* recovery for his services, separate from his authorship/ownership interests in CICGC copyright.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint must be denied.

---

[11]    Of course, Charles does not waive his right to seek statutory damages, costs and/or attorney's fees, as well as injunctive relief.

**Dated**: October 27, 2018                                   **CLARK GULDIN**
                                                              Attorneys at Law

                                                              By: _/s/ Peter L. Skolnik_____
                                                              Peter L. Skolnik (PS 4876)
                                                              Of Counsel
                                                                   20 Church Street, Suite 15
                                                                   Montclair, New Jersey 07042
                                                                   (973) 707-5346
                                                                   *Attorneys for Plaintiff*
                                                                   *Christian Charles*