**CLARK GULDIN**
Attorneys At Law
20 Church Street – Suite 15
Montclair, New Jersey 07042
(973) 707-5346 (ph)
(973) 707-7631 (fax)
*Attorneys for Plaintiff*
*Christian Charles*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTIAN CHARLES,** <br><br> Plaintiff, <br><br> v. <br><br> **JERRY SEINFELD, COLUMBUS 81 PRODUCTIONS, INC., EMBASSY ROW, LLC, COMEDIANS IN CARS, LLC, SONY PICTURES TELEVISION INC., NETFLIX, INC.** <br><br> Defendants. | **Civil Action No. 1:18-cv-01196 (AJN-KHP)** <br><br> **DECLARATION OF PETER L. SKOLNIK, ESQ.** |

I, **PETER L. SKOLNIK,** hereby declare:

1.      I am Of Counsel to Clark Guldin, Attorneys at Law, counsel for plaintiff Christian Charles in this matter. I make this declaration in support of plaintiff's opposition to defendants' motion for attorneys' fees and costs.

2      Annexed hereto as **Exhibit A** is a true and correct copy of Jay L. Cooper's January 10, 2018 email to Christian Charles.

3.      Annexed hereto as **Exhibit B** is a true and correct copy of Martin Flumenbaum and Brad S. Karp, *The Rarity of En Banc Review In the Second Circuit,* NEW YORK LAW JOURNAL (August 24, 2016).

4.      Annexed hereto as **Exhibit C** is a true and correct copy of Tillman J. Breckenridge, Petitioning for Further Review After Losing a Federal Appeal, In-House Defense Quarterly (Summer 2010).

5.      Annexed hereto as **Exhibit D** is a true and correct copy of J. Alexander Lawrence, *Commentary: Claims Filing Time Issues On Copyright Ownership From Everly Bros. Case,* LAW JOURNAL NEWSLETTERS (July 2020).

## <u>DECLARATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true.

 /s Peter L. Skolnik
 Peter L. Skolnik (PLS 4876)

Executed on:   August 10, 2020

# EXHIBIT A

| | |
|---|---|
| **From:** | herrickr@gtlaw.com on behalf of cooper@GTLAW.com |
| **To:** | christian@christiancharles.com |
| **Subject:** | RE: NOTICE TO JERRY SEINFELD - COMEDIANS IN CARS GETTING COFFEE |
| **Date:** | Wednesday, January 10, 2018 4:27:10 PM |
| **Attachments:** | image001.jpg |

Dear Mr. Charles,

This office represents Jerry Seinfeld.

Jerry has forwarded to us your email of December 27, 2017 in which you claim to be the creator of "Comedians in Cars Getting Coffee."

Jerry has great respect for you and is very appreciative of your past work with him, however, your claim to be the creator of this show is without any basis in fact or law.

Jerry actually conceived of the concept for this show during a road trip he and Barry Marder took starting July 24, 2000, in which they drove cross country together in a Volkswagen. We have documentation that Mr. Seinfeld registered the concept and the title "Comedians in Cars Getting Coffee" in February of 2011. This is 6 months prior to him asking you to meet him at the Princess Diner in Southampton in August of 2011 where he first disclosed it to you. At this meeting you were asked to simply shoot the idea.

We are also in possession of an email sent on your behalf on April 11, 2012 from Anne Estonilo to Carolyn Liebling, Jerry's representative, releasing all claims of future compensation provided the requested outstanding show production costs were paid. Those costs were paid immediately thereafter and even though no future rights were ever offered to your company or contracted to with you or anyone representing you.

As a result of all of the foregoing, your claim is without merit and all such claims are denied in their entirety.

Should you desire to pursue this unwarranted claim, or make any such false claims known to any third person or the public, our client will in turn seek appropriate damages and remedies against you.

This communication is not intended as an all-inclusive enumeration of our client's rights, claims, remedies or damages and our client reserves all of his claims, rights and remedies in the premises.

Regards,

**JAY L. COOPER**
**Founder, West Coast Entertainment Practice**
Greenberg Traurig, LLP | 1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
Tel 310.586.7888 | Fax 310.586.0580
cooper@GTLAW.com | www.gtlaw.com

# EXHIBIT B

# New York Law Journal

WWW.NYLJ.COM

VOLUME 256—NO. 38

An **ALM** Publication

WEDNESDAY, AUGUST 24, 2016

**SECOND CIRCUIT REVIEW**

**Expert Analysis**

# The Rarity of En Banc Review In the Second Circuit

n two weeks, football fans across the country will celebrate their home teams' return to the gridiron. But New England Patriots fans will have to wait an additional month for their starting quarterback to take the field, thanks in part to the Second Circuit's denial of Tom Brady's petition for rehearing en banc of a panel decision reinstating his four-game suspension.[1] Despite the extravagant media coverage of Brady's petition for a rehearing en banc, the Second Circuit's decision denying the petition should have come as no surprise to experienced court observers. Since 1979, the U.S. Court of Appeals for the Second Circuit has consistently granted fewer petitions for rehearing en banc than any other circuit court, both in absolute terms and relative to the court's caseload,

MARTIN FLUMENBAUM and BRAD S. KARP are members of Paul, Weiss, Rifkind, Wharton & Garrison. ADAM ROSS MANDELSBERG, a litigation associate, assisted in the preparation of this column.

 

By **Martin Flumenbaum** And **Brad S. Karp**

as indicated in the accompanying table.[2]

This trend, which we first discussed in this column more than 30 years ago and originated with

> Since the beginning of 2011, the Second Circuit has reconsidered only two appeals en banc, compared to an average of 12 across all circuits during the same period.

Judge Learned Hand in the 1940s, has become more pronounced in recent years (see Table, Number of Rehearings En Banc Granted by Circuit, 2011 to July 2016, on p. 7).[3] Since the beginning of 2011, the Second Circuit has reconsidered

only two appeals en banc,[4] compared to an average of 12 across all circuits during the same period. By way of example, the Sixth Circuit, facing a similar number of total appellate filings from 2011 through July 2016, granted en banc review 17 times.[5]

## Circuit's En Banc Practice

Federal Rule of Appellate Procedure 35(a) provides for en banc rehearing of a panel decision on the vote of a majority of active circuit judges, while emphasizing that en banc review "is not favored and ordinarily will not be ordered unless" either "necessary to secure or maintain uniformity of the court's decisions," or the case presents "a question of exceptional importance." But as former Chief Judge Jon O. Newman explained in a series of articles published from 1984 to 1994, the Second Circuit generally regards the presence of such circumstances as necessary

In some jurisdictions, this reprint may be considered attorney advertising. Past representations are no guarantee of future outcomes.

New York Law Journal

but not sufficient to trigger en banc review.

On more than 70 occasions, however, the Second Circuit has used an informal version of en banc review (known as "mini en banc"). Unlike the traditional en banc protocol which generally features a new round of briefing and argument before the full court, the mini en banc reflects a more streamlined review process. A Second Circuit panel may invoke the mini en banc sua sponte by circulating a draft opinion internally to all active judges for comment. The opinion will then be published—generally accompanied by a footnote indicating that the opinion was circulated prior to publication—if no other judge requests a vote for rehearing en banc or if a requested vote fails to garner majority support.[6]

The Second Circuit has generally adopted the mini en banc procedure where consideration by the full court is statutorily available but deemed unnecessary, such as when a panel concludes that intervening Supreme Court authority has impliedly overruled Second Circuit precedent.[7] Aside from the Seventh Circuit (which has issued more than 270 mini en banc rulings), the Second Circuit has issued more than twice as many mini en banc decisions as any of its sister circuits.[8] Similarly, the Second

Circuit has applied the "exceptional importance" label sparingly, recognizing that "'exceptional importance' is frequently in the eye of the beholder."[9]

## Reasons for Limited Review

Writing in 1989, Chief Judge Jon Newman cited three main reasons for the Second Circuit's institutional reluctance to rehear cases en banc.[10] First, Judge Newman explained that the Second Circuit views en banc rehearing as an inherently inefficient extra layer of appellate review that imposes significant travel and preparation burdens on the court's active judges. Second, Newman observed that "frequent use of the in banc practice surely poses a threat" to a court's collegiality. Judge Newman attributed the absence of vitriolic language in Second Circuit opinions, compared to that present in opinions issued in other circuits, to "the infrequency of the occasions when we confront each other as members of an in banc court."

Newman also cautioned against judges' use of the en banc hearing "so that the world will be enlightened as to their view of the dispute at hand." Speaking of the Second Circuit, Newman said there is a modesty to judges' willingness to allow assigned panels to decide the cases before them, regardless

of their feelings about a particular panel's disposition of a specific case.

## Dissension

In the 30 years since Judge Newman described the Second Circuit's motivations for maintaining a limited en banc caseload, the court has become even more parsimonious in granting en banc rehearings. Somewhat ironically, the past two decades have seen a significant increase in dissents from denials of rehearing en banc, and a concomitant increase in use of the mini en banc procedure.

Since 1999, denials of en banc rehearing have elicited one or more dissenting opinions on 33 separate occasions, three times as many as occurred during the previous 17-year span.[11] Such dissents have generally been authored by four highly respected judges (Judges Dennis Jacobs, Jose Cabranes, Reena Raggi, and Debra Livingston) who have taken issue with the court's reluctance to rehear cases that they view to be important and/or erroneously decided by the assigned panel.

Judge Jacobs' dissent from a denial of rehearing in *Zhong v. U.S. Department of Justice*[12] is illustrative. Joined by Judges Cabranes and Raggi, Judge Jacobs criticized the Second Circuit's decision not to rehear a panel ruling

New York Law Journal                                                                                    WEDNESDAY, AUGUST 24, 2016

that effectively overruled court precedent on a question of "exceptional importance." In reviewing an alien's petition for review of a Board of Immigration Appeals decision despite his failure to exhaust all available administrative remedies, the panel set aside *Foster v. INS*,[13] which had held that the court lacked jurisdiction to review an alien's unexhausted claim.

Judge Jacobs characterized the court's present practice as "so rusty and cumbersome that its desuetude will allow a single panel to skate past full court review," and warned that it lays the groundwork for future panels to overrule such precedent anew, "with equal authority and equal occasion and equal legitimacy." He concluded that such an ad hoc decision-making process is "institutionally dangerous."

## Conclusion

Although Tom Brady's appeal was an imperfect vehicle for en banc review, it seems likely that the Second Circuit's historical reluctance to engage in en banc review will be tested in the years to come both by litigants and an increasingly spirited contingent of respected Second Circuit judges who appear somewhat less wed to the circuit's idiosyncratic en banc precedent. How this will play out is uncertain, but maintaining the

court's collegiality is a priority of Chief Judge Robert Katzmann. It is telling in this regard that Chief Judge Katzmann dissented from the panel majority in the Brady appeal, but did not dissent from the court's

| Number of Rehearings En Banc Granted by Circuit, 2011 to July 2016 | |
|---|---|
| Circuit | Total Number Of Cases |
| D.C. | 4 |
| First | 4 |
| Second | 2 |
| Third | 9 |
| Fourth | 7 |
| Fifth | 17 |
| Sixth | 17 |
| Seventh | 13 |
| Eighth | 19 |
| Ninth | 40 |
| Tenth | 6 |
| Eleventh | 7 |

SOURCE: The authors, based on case law research.

denial of the petition for rehearing en banc. Whether this subtle shift in en banc approach will continue (more dissents from en banc denials and greater use of the mini en banc)—and, if so, whether the court's renowned collegiality will suffer as a consequence—remains to be seen.

•••••••••••••●●••••••••••••

1. *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 534, 539 (2d Cir. 2016) (finding that the commissioner's decision to discipline Brady for engaging in "conduct detrimental to the integrity of and public confidence in the game of professional football" was "plausibly grounded" in the collective bargaining

agreement between the NFL and the NFL Players Association), reh'g denied, No. 15-2801, Doc. 323 (July 13, 2016). The authors' firm conducted the independent investigation in the Brady football "deflation" matter that concluded it was "more probable than not" that conduct violative of the collective bargaining agreement had in fact occurred.

2. See Table:  Number of En Banc Cases by Circuit, 2011 to July 2016 (reflecting original case law research); Second Circuit Courts Comm., En Banc Practices in the Second Circuit: Time for a Change? FEDERAL BAR COUNCIL, July 2011, at 6; Jon O. Newman, "In Banc Practice in the Second Circuit, 1989-93," 60 BROOK. L. REV. 491, 491 (1994) [Newman III]; Jon O. Newman, "In Banc Practice in the Second Circuit, 1984-88," 55 BROOK. L. REV. 355, 355-56 (1989) [Newman II]; Jon O. Newman, "In Banc Practice in the Second Circuit: The Virtues of Restraint," 50 BROOK. L. REV. 365, 365 (1984) [Newman I].

3. See Martin Flumenbaum and Brad S. Karp, "Second Circuit Review: Recent Developments," 195 NYLJ 37 (Feb. 1986).

4. See *United States v. Ganias*, — F.3d —, 2016 WL 3031285 (2d Cir. May 27, 2016) (en banc); *Poventud v. City of N.Y.*, 750 F.3d 121 (2d Cir. 2014) (en banc).

5. See United States Courts, U.S. Court of Appeals—Judicial Caseload Profile, FEDERAL COURT MANAGEMENT STATISTICS, March 31, 2016, at 7, 15.

6. See Amy E. Sloan, "The Dog That Didn't Bark: Stealth Procedures and the Erosion of Stare Decisis in the Federal Courts of Appeals," 78 FORDHAM L. REV. 713, 725-28 (2009).

7. See, e.g., *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 107 & n.2 (2d Cir. 2015) (noting that "[t]he panel's opinions have been circulated to all active members of this Court prior to filing").

8. See Sloan at 728.

9. See Newman I at 371.

10. See Newman II at 369.

11. See Mario Lucero, "The Second Circuit's En Banc Crisis," 2013 CARDOZO L. REV. DE NOVO 32, 68-73 (2013) (supplemented with original case law research covering post-2012 time frame).

12. 489 F.3d 126, 134-39 (2d Cir. 2007) (mem.).

13. 376 F.3d 75, 77-78 (2d Cir. 2004).

Reprinted with permission from the August 24, 2016 edition of the NEW YORK LAW JOURNAL © 2016 ALM Media Properties, LLC. All rights reserved. Further duplication without permission is prohibited. For information, contact 877-257-3382 or reprints@alm.com. # 070-08-16-25

# EXHIBIT C

Deciding When to Go Forward                                    By Tillman J. Breckenridge

# Petitioning for Further Review After Losing a Federal Appeal

The last thing anyone wants to think about in the midst of litigation is losing an appeal. But it is important to be prepared,

because when an opinion comes down, a short clock starts ticking, and you will need to decide quickly whether to move up or move on. As an appellate litigator with a healthy chunk of my practice devoted to Supreme Court work, clients often approach me after they have already lost in a court of appeals. They often want to know whether it is worth it to go forward with a petition for rehearing en banc or a petition for certiorari in the Supreme Court. This article will discuss when to file either petition and how to evaluate whether it is worth the cost.

The first rule of evaluating whether to go forward with a petition for rehearing en banc or a petition for certiorari is to start with the assumption that either petition would be a waste of time and money. Unfortunately, it is usually too late to salvage a case once the court of appeals has ruled. The Supreme Court grants certiorari in about one percent of the cases brought before it. Take out the *in forma pauperis* petitions—which leaves the "paid" cases— and the number only goes up to four percent. In most circuits, it is even tougher to get a petition for rehearing en banc granted. That does not mean that giving



■ Tillman J. Breckenridge is a senior associate in Fulbright & Jaworski, L.L.P.'s Washington, D.C., office, where he works in the Supreme Court and appellate practice group. Mr. Breckenridge is a member of DRI's Appellate Advocacy and Diversity Committees.

a serious look at options for moving forward is a bad idea. But you must approach the question with caution in order to invest your company's money wisely.

If your appellate counsel does not appear to be approaching the question with that first rule in mind, consider it a red flag and consider getting a second opinion. There are several reasons why counsel who just lost your appeal might be gung-ho about going forward with a petition. First, and foremost, is the same reason I always advise clients to use different lawyers on appeal than they used at the trial level— when a lawyer has invested so much time, energy, and intellectual capital into a case, it is hard to be objective. And objectivity is essential to any decision on what to put in front of an appellate court. Second, counsel may be embarrassed or concerned that the loss has diminished him or her in your eyes. He or she will want the opportunity for vindication and to finish the litigation as a winner. Third, if you didn't have an experienced appellate lawyer handle your appeal, he or she may not fully understand the odds the case is up against. Finally, there are, unfortunately, a few lawyers out there who would let the extra billing opportunity play some role in his or her advice as to whether to proceed. Of course, most lawyers will be able to give you fair, objective advice regarding whether to file a petition, so it usually will not be necessary to seek out a second opinion. But there are many reasons why a lawyer might not proceed with necessary caution, and in-house counsel should be comfortable with the questions that go into deciding whether to go forward with a petition for rehearing en banc or a petition for a writ of certiorari.

## Elements of a Petition for Panel Rehearing/Rehearing En Banc That Has an Appreciable Chance at Success

When filing a petition for rehearing, you will almost always petition for both a panel

rehearing and rehearing en banc. Most circuits automatically consider any petition for rehearing en banc as a petition for panel rehearing, and there is generally no harm in asking for both. Panel rehearing is particularly appropriate when the opinion turned on the panel's mistake regarding an undisputed or indisputable fact.

The Federal Rules of Appellate Procedure (FRAP) require a petitioner for a panel rehearing to "state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended." FRAP 40(a)(2). On its face, that is a very tough standard to meet. And it demands an ability to articulate a critical fact or legal ruling that the panel obviously missed. It is exceedingly rare to see a panel reverse itself based on a legal error. For that reason, any purported mistake of law should include a request for rehearing en banc as well.

En banc rehearings are also very rare. Indeed, the rules include express discouragement against filing a petition. En banc rehearings are "not favored and ordinarily will not be granted." FRAP 35(a). They will only be granted in one of two circumstances. *Id.* Rehearing en banc is appropriate when (1) there is a split within the circuit on a legal issue, or (2) "the proceeding involves a question of exceptional importance." FRAP 35(a). Viewing those two standards in the abstract, it would seem that the latter is the more effective ground on which to base a petition. After all, a court will not often recognize that it has two conflicting cases. The first case was, or should have been, raised in the appeal on which the petition is based. On the other hand, courts of appeals decide questions of exceptional importance all the time. Almost all appeals are exceptionally important to the parties. Otherwise, they would not spend the time or money.

The strongest petition for rehearing en banc exposes a conflict between holdings within the circuit. That makes sense when

© 2010 DRI. All rights reserved.

APPELLATE ADVOCACY

you consider the role of an appellate court. Appellate courts are courts of "review." They exist primarily to ensure that the trial courts got the law right. Naturally, their jobs are easier, and their dockets are less burdensome, when trial courts are getting the law right more often. And their jobs are tougher when the court has given trial courts a mixed message on what the law is. When there is an intra-circuit split, the court's docket will soon be burdened with more appeals on the same issue because litigants will be less likely to settle before an appeal when they both can cite purportedly binding precedent in their favor. Taking it one step further, intra-circuit splits increase litigation altogether because parties are more likely to engage in behavior that results in a lawsuit when the law is not clear, and they are less likely to settle at the trial level as well.

Identifying an intra-circuit split allows the petitioner to appeal to the judges' base senses of judicial efficiency and fairness of the process and can offer a compelling justification for taking on more work in the near term. Thus, the first question that should be asked when considering filing a petition for rehearing en banc is whether there is an intra-circuit conflict. If the answer is "no," then a petition for rehearing en banc will almost certainly be a waste of time and money. If the answer is "yes," it remains far from a conclusion that you have a strong petition for rehearing en banc, but you probably have one that's at least worthy of weighing against the cost of losing (or winning) the petition.

One common mistake of counsel is to believe, and argue, that en banc rehearing is needed because the panel's decision conflicts with the decisions of other circuits or state courts of last resort (which is generally, and under-inclusively, referred to as a "circuit split"). While this may be a persuasive fact to mention in the petition to establish that there are judges who support your position, and it may be helpful to establish the importance of an issue, it is *not* a ground for a petition for rehearing. FRAP 35 does not include a circuit split among the reasons for granting a petition for rehearing, and judges will generally disregard a petition that overemphasizes other circuits' decisions. Again, the role of the court of appeals

is important here. Appellate judges know that, while they should generally avoid creating circuit splits, it is not the court of appeals' job to correct circuit splits. That role is reserved for the Supreme Court.

If there is an intra-circuit conflict, the next question to ask is how simple the conflict is to grasp. A petition for rehear-

---

■

## The strongest petition for rehearing en banc exposes a conflict between holdings within the circuit.

■

---

ing en banc starts with a short statement, usually only a few sentences, stating the reason that rehearing is necessary. FRAP 35(b)(1). Your counsel must be able to grab a judge's attention with just that statement. After that, counsel has less than 15 pages to fully explain the facts of the case, the intra-circuit conflict, and the issue's importance. Thus, your counsel must write the petition in a way that the panel's error, or the conflict at least, smacks the judge in the face. That often is not a challenge if there is a conflict on an intuitive issue that appellate judges see all the time—such as the proper standard of review or a pleading standard. But when it is a complex issue, like a narrow area of securities law that requires understanding several different financial products, your counsel must be especially gifted at breaking a complex issue down into simple terms and drawing a black-and-white contrast with no shades of gray. The more complex the issue is, the less likely you are to win a petition for rehearing en banc, and you should consider that when weighing the cost of filing the petition against the cost of giving up or going straight to a petition for certiorari.

Finally, you should consider the importance of the case to the court and the public. Even in cases involving an intra-circuit conflict, you must impress upon the court the importance of the issue that was incorrectly decided. Granting a petition for

rehearing is completely discretionary for the court; thus, it is not enough to simply establish that your legal issue meets one of FRAP 35's two criteria for granting the petition. It must be carefully explained to the court why the panel's error will not only damage your company, but thousands of other similarly situated companies. Or it must be explained how the intra-circuit conflict will lead to strained dockets and confused trial judges, or how the panel's decision will have a deleterious effect on the public. Circuit judges will rarely be concerned if the purported error that creates an intra-circuit conflict really only affects your company, will not be a recurring problem, and will not have any secondary effects on the public.

Despite its equal footing in FRAP 35, the "exceptional importance" basis for granting a petition for rehearing en banc is somewhat illusory when it is not paired with an intra-circuit conflict. Courts rarely grant a petition for rehearing en banc on that ground alone. Indeed, the petition for rehearing en banc in *Ricci v. DeStefano* caused a now-famous—thanks to Justice Sotomayor's confirmation hearing—public debate among the Second Circuit judges on the role of en banc rehearings and whether to grant them in cases of "exceptional importance." The case involved a local government's decision not to certify test results because the test left too many minority firemen ineligible to become officers, and the government was concerned that it would be sued for discrimination. The denial of the petition for rehearing en banc generated three concurrences and two dissents. *Ricci v. DeStefano*, 530 F.3d 88 (2d Cir. 2008). Judge Cabranes, in the main dissent, stated that the case raised "important questions of first impression... regarding the application of the Fourteenth Amendment's Equal Protection Clause and Title VII's prohibition on discriminatory employment practices." *Id.* at 93 (Cabranes dissent). But that was not enough to elicit the votes needed for rehearing.

The main concurrence focused on the lack of an intra-circuit conflict and the fact that both the district court and the panel decided consistently with circuit precedent. *Id.* at 90 (Parker concurrence). Judge Katzmann suggested in his concurrence

that he did not agree with the panel, but he voted against rehearing to be "consistent with [the] Circuit's longstanding tradition of deference to panel adjudication." *Id.* (Katzmann concurrence). Judge Calabresi conceded that the question was at least "interesting," but agreed with both the main concurrence and Judge Katzmann's concurrence urging restraint. *Id.* at 88. Chief Judge Jacobs appeared incredulous in dissent at the notion that petitions for rehearing should be denied as a matter of "tradition." *Id.* at 92 (Jacobs dissent). But Chief Judge Jacobs was in the minority by one vote, and "tradition" caused the court to exercise its discretion not to grant rehearing in a case involving legal issues that would affect all businesses and governments on an issue—race—that is subject to "strict scrutiny." In a case involving "novel questions that are indisputably of 'exceptional importance,'" that ground could not garner enough votes by itself to obtain a rehearing en banc. *Id.* at 101. On the other hand, it is difficult to imagine a judge voting against rehearing en banc because of "tradition" in a case that conflicted with circuit precedent.

The hurdle is incredibly high to obtain rehearing based on the issue being of "exceptional importance." Unless there is a dissent or special concurrence from the original panel stating that existing precedent should be overturned, filing a petition for rehearing en banc based solely on the "exceptional importance" ground is almost never an effective use of your company's funds.

### Elements of a Petition for a Writ of Certiorari That Has an Appreciable Chance at Success

Like a petition for rehearing, an ideal cert petition establishes that there are conflicting opinions on the same legal issue and that the issue is of exceptional importance. Supreme Court Rule 10 sets out the "character of the reasons the Court considers" in exercising its discretion to grant a cert petition. The three criteria it gives are (1) a circuit court has decided an important case that conflicts with another circuit or a state court of last resort, or it has done something so outside its powers that it requires application of the Supreme

Court's supervisory role; (2) "a state court of last resort has decided an important federal question in a way that conflicts with... another state court of last resort or" a circuit court; and (3) a state court or a circuit court has decided an important federal question that has not been addressed by the Supreme Court or in a way that conflicts with Supreme Court precedent. Those are pretty ambiguous standards, but the rule of thumb is that if you do not have a conflict among the courts, then filing a cert petition is usually not advisable.

There are, of course, exceptions to the need for a circuit split. There are occasional cases in which a circuit split is impossible or so highly unlikely that requiring a circuit split would make the lower court's decision effectively unreviewable. The Court also tends to take cases in which an act of Congress has been declared unconstitutional immediately. Finally, there are some cases that simply strike the Court as being important enough to warrant immediate review. When a case falls into the first category, that will be obvious. And the second category generally belongs to cases in which the government will be the petitioner. The third category, though, is amorphous. But as corporate counsel, you will need to evaluate how important your case is to the country. Almost always, the answer will be "not important enough," but the fact that these cases are rather rare should not cause you to dismiss the possibility of review without giving it your full consideration.

The Supreme Court is more likely to grant a cert petition based on the importance of an issue than a circuit court is to grant rehearing. *Ricci* provides the perfect example. There, rehearing was denied over acrimonious dissent even though it appears that a majority of the judges thought the panel's opinion was wrong and that the issue was highly important. Shortly thereafter, the Supreme Court took the case without a clear circuit split. Similarly, the Court took *Quon v. City of Ontario*, No. 08-1332 (also known as "the sexting case"), this term with no clear circuit split presumably because it addressed the intersection of privacy law, employment law, and emerging technologies. Under the right circumstances, a cert petition may be worth it even without a circuit split.

One final consideration to determine the strength of your potential cert petition is whether it will attract amicus support. Even if a circuit split exists, the Court is highly unlikely to take the case if the petitioner cannot present a reasonable argument as to how the split will have a negative effect on the country, the people, or its businesses. A petition amicus emphasizes a case's importance. If an industry organization or a group of states file a brief saying the question presented is important to an entire segment of the country or the economy, your petition is more likely to get noticed. If you feel that your issue will warrant amicus support, then you should consider that a plus for filing a petition for a writ of certiorari.

### Whether to File a Meritorious Petition

Once you have determined that you have a legal issue that would support a petition with an appreciable chance at success, you have to weigh the chance of success against the cost. Figuring out whether the legal issue and likelihood of the petition's success justify the cost estimate is the easy part. And people sometimes stop there, after determining whether the expense is worth it if the petition fails. But considering the cost of your petition being granted is a critical step to evaluating whether to file at all. You must weigh that not only against the cost of preparing and filing the petition, but also against the cost of preparing and filing all of the subsequent briefs. It makes no sense to spend thousands of dollars on a petition for rehearing en banc if the case is not worth the money you will have to spend to brief and argue after the petition is granted.

You must also evaluate the strength of the case on the merits, the inclinations of the court you are addressing, and how the appeal was prosecuted by your counsel. The first issue is likelihood of success when the case is reheard en banc or on the merits case in the Supreme Court. You and your counsel (perhaps *new* counsel if there are concerns over your current counsel's ability to be objective) must take an unbiased look at the legal issue presented, the facts of the case, and the reasonableness of your position. You must also consider the inclinations of the court. If it is a court that

APPELLATE ADVOCACY

consistently rules against your side on similar legal issues, then it may not be worth the money to file the petition and subsequent briefs.

Additionally, you have to consider the costs associated with further entrenching bad law if you lose on the merits. Once an issue is taken to an en banc circuit panel or to the Supreme Court and lost, that legal rule is etched in stone so that a party cannot, usually, re-challenge the issue once a case with better facts comes along. If there is a tough employment law issue that you would like to have reversed, it may make more sense to wait until a less sympathetic plaintiff raises the same issue so that you can go to the en banc panel with the new plaintiff. That circumstance is rare, though, because the chance of getting rehearing en banc drops when a party comes up the second time to challenge precedent that has been around for a while.

On the other hand, the chance for Supreme Court review does not drop for subsequent cases. And with the Supreme Court, there is the additional concern of spreading your bad legal ruling throughout the country. Of course, if you work at a regional company, that is less of a concern because you just have to look out for your client. But if you represent a national company, you have to consider how much damage will occur if you lose that issue of employment law (or something else) in the Supreme Court and suddenly a legal rule that previously hurt you in just one part of the country now hurts you everywhere else. The good news is that it is somewhat unlikely that the Supreme Court will grant a petition but then affirm the challenged decision—the Court's reversal rate is about 75 percent—but a bad ruling in the Supreme Court can sometimes be devastating, and a company has to evaluate what it wants in the Supreme Court against what it can live with at the circuit level.

Because losing on the merits can cost far more than simply the money spent on briefing and argument, it is important to consider how good a job trial and appellate counsel have done to this point as well. You should be sure that trial counsel developed an adequate factual record to support the legal conclusion you want the court to reach. And you must make sure that appellate counsel has already raised the issue you want the court to address because a waiver argument can inflict serious damage on a petition, even if the waiver argument is ultimately unsuccessful. If an argument is even potentially waived, that weighs against moving forward. Though this factor is far from conclusive, it is an important consideration because counsel now must spend words in the brief and time in the oral argument fighting for credibility just because the other side raised waiver. That distracts the court from the merits issue it should focus on and it starts the petitioner off in a credibility deficit that must be made up in order to win.

Finally, you should consider the elements that may make a petition unworthy even if you win on the merits. A company must consider the potential loss of goodwill associated with having its name attached to an unpopular Supreme Court decision. For companies that rely heavily on consumer appeal, this is no small concern. Additionally, a petitioner must weigh the time it takes to work through the whole process. There are plenty of cases where an issue will be dead by the time a petitioner files a petition for rehearing, gets a ruling, files a petition for rehearing en banc, gets a ruling on that, files a petition for certiorari, and has the case heard on the merits. Courts can leave rehearing petitions pending for months on end, and it will usually take about a year or more for a Supreme Court case to get from filing a petition to a decision.

There is no magic formula for determining whether a petition for rehearing en banc or a petition for a writ of certiorari is worth filing. There will be cases where, despite failing all of the tests mentioned above, the cost of quitting is too great. And there will be many, many cases that pass all of the above tests and still the petition is not granted. But if you start with the presumption that the petition is not worth filing, and then evaluate the petition's chance of success and weigh that against the costs correctly, you can go forward more confidently or save your company a lot of money and a lot of headaches by not filing at all.

# EXHIBIT D



# LAW JOURNAL NEWSLETTERS

**NOT FOR REPRINT**

Click to Print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.lawjournalnewsletters.com/2020/07/01/commentary-claims-filing-time-issues-on-copyright-ownership-from-everly-bros-case/*

ENTERTAINMENT LAW & FINANCE

JULY 2020

# Commentary: Claims Filing Time Issues on Copyright Ownership from Everly Bros. Case

By J. Alexander Lawrence

Throughout the late 1950s and early 1960s, the Everly Brothers had a string of hits: "Bye Bye Love," "Wake Up Little Susie," "All I Have to Do Is Dream" and many more. Don and Phil Everly's flawless harmonies regrettably ended in acrimony. In *Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020), the U.S. Court of Appeals for the Sixth Circuit issued a decision in a dispute between Phil's heirs and Don over copyright ownership of the No. 1 hit "Cathy's Clown."

The U.S. District Court for the Middle District of Tennessee granted summary judgment to Don, finding the claim that Phil also authored the song was time-barred. The Sixth Circuit reversed and remanded, finding genuine issues of fact as to whether Don expressly repudiated Phil's authorship of the song more than three years before the filing of the action.

Circuit Judge Eric E. Murphy, in his concurrence, raised important questions about when the statute of limitations should begin to run in copyright cases and whether courts have been correctly applying the law. (Also see the article "Federal Appeals Courts Weight in On Accruals For Copyright Infringement vs. Ownership Claims Copyright Statute of Limitations," *Entertainment Law & Finance*, June 2020, p. 1.)

The statute of limitations for civil copyright actions is set forth in 17 U.S.C. §507(b) of the U.S. Copyright Act. The Act provides, "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."

In the *Raging Bull* case, the U.S. Supreme Court held that laches cannot be used to cut off the right to pursue new acts of infringement within the three-year window, even if the infringement had been ongoing for years with the plaintiff's knowledge. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014). The Supreme Court further clarified that, "when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright

holder's suit ordinarily will be timely under §507(b) with respect to more recent acts of infringement (*i.e.*, acts within the three-year window), but untimely with respect to prior acts of the same or similar kind."

In the context of infringement actions post-*Petrella*, courts generally continue to follow a discovery rule and hold that the statute of limitations does not begin to run until the plaintiff learned, or by reasonable diligence could have learned, that it had a cause of action.

In the context of an ownership dispute, courts have generally followed a similar discovery type rule. To determine the accrual date of a claim for copyright ownership, the statutory period for any action to establish ownership begins to run whenever there is a "plain and express repudiation" of ownership by one party as against the other. *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000); *see also, Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112 (2d Cir. 2018); and *Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004).

The repudiation that starts the three-year clock can take many forms. For instance, the Second Circuit has recognized three types of repudiation — direct repudiation, publication of the work without credit and non-receipt of royalties — and refers to them as private repudiation, public repudiation and implicit repudiation. *Wilson*, 892 F.3d at 118. And unlike an infringement action, where a new statute of limitations begins with each discrete act of infringement, a claim for ownership "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Zuill v. Shanahan*, 80 F.3d 1366 (9th Cir. 1996).

Circuit Judge Murphy questioned how the statute of limitations rule generally applied in copyright ownership disputes squares with the language of the Copyright Act. As his first basis of criticism, Judge Murphy questioned the generally applied test because it triggers the limitations period when a plaintiff has knowledge of a repudiation, not when a cause of action has "accrued." Judge Murphy recognized that courts usually choose between two rules to determine when a statute of limitations begins to run. The "occurrence rule," or "injury rule," begins the limitations period on the date that a violation of the plaintiff's legal right has occurred. The "discovery rule" begins on the date that the plaintiff discovered or should have discovered the cause of action.

Judge Murphy noted that the Supreme Court recently expressed skepticism of a discovery rule absent express statutory language that the limitations period begins upon discovery of the claim, criticizing the "expansive approach to the discovery rule [as] a 'bad wine of recent vintage.'" *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) (*quoting TRW Inc. v. Andrews*, 534 U.S. 19 (2001) (Scalia, J. concur)). Applying a textual analysis in *Rotkiske*, the Supreme Court rejected the application of a discovery rule under a federal statute where Congress did not say that the limitations period begins to run upon discovery of the violation.

Rightly recognizing that the Supreme Court in *Petrella* did not reject the use of a discovery rule in copyright infringement actions. Judge Murphy noted, however, that the Court has twice cautioned that it has "not passed on the question" of whether the Copyright Act statute of limitations should apply a discovery rule. *Petrella*, 572 U.S. at 670 n.4; *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods. LLC*, 137 S. Ct. 954, 962 (2017).

Judge Murphy expressed the view that, based on its plain language, the Copyright Act statute of limitations should be interpreted as an occurrence rule, rather than a discovery rule. He notes that the plain-and-express repudiation test in a copyright ownership cases does not

apply an occurrence rule asking whether the defendant has violated a legal right triggering the plaintiff's ability to seek relief in court. Rather, he suggests it wrongly applies a discovery rule asking whether the plaintiff knew of the defendant's rejection of the plaintiff's ownership status.

Other courts addressing the question have held that they are bound to follow precedent until such time as the U.S. Supreme Court decides that the discovery rule no longer applies. *See, e.g., Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d Cir. 2020) ("Consequently, while some language in *Petrella* is perhaps consistent with the injury rule, in light of the Supreme Court's direct and repeated representations that it has not opined on the propriety of the discovery or injury rules, it would contravene settled principles of stare decisis for this Court to depart from its prior holding … on the basis of *Petrella*.").

Nonetheless, based on its recent pronouncements, Judge Murphy perhaps correctly predicts that the Supreme Court may one day hold that the plain text of the Copyright Act's statute of limitations mandates an occurrence rule, rather than a discovery rule.

As his second basis of criticism, Judge Murphy questioned the generally applied test because it treats copyright ownership as a complete "claim," not as a legal element of a separate claim. Judge Murphy noted that, while ownership may be an element of various claims, it is not a standalone cause of action. When not styled as a declaratory judgment action, a copyright ownership (or authorship) case could take many forms: accounting, infringement or perhaps in connection with asserting statutory termination rights. Although the plaintiff could seek a declaration of its rights earlier, the plaintiff would not necessarily have a complete and present cause of action at the time that the defendant made a plain-and-express repudiation of ownership (or authorship).

For instance, Judge Murphy questioned how to square the generally applied test in an infringement action where ownership is in dispute. In such actions, two elements must be proven: 1) ownership of a valid copyright; and 2) copying of constituent elements of the work that are original. If under *Petrella* each new act of infringement starts a new statute of limitations period, why is the plaintiff forever foreclosed from establishing ownership if not commenced within three years of repudiation? Judge Murphy asked what if a party who wants to infringe sends a notice repudiating ownership but waits three years to infringe? If the real owner does not immediately file a declaratory judgment action, is the true owner foreclosed from establishing ownership in an infringement action?

As recently recognized by Southern District of New York Judge Lewis A. Kaplan in *Waite v. UMG Recordings*, 19-cv-1091 (S.D.N.Y. 2020), cutting off all rights after three years would be unfair in many actions where ownership is the key issue. In that case, the artist plaintiffs brought infringement actions against UMG when it continued to exploit musical works after the effective date of the artists' claimed termination of the copyright grant to UMG under §230 of the Copyright Act. UMG argued in part that the artists were not the authors because the sound recordings at issue were works made-for-hire. Thus, from UMG's perspective the artists had no right to terminate the copyright grants under §230. UMG argued that the artists were put on notice of an authorship and ownership dispute — thereby triggering the three-year statute of limitations period — in the 1970s and 1980s, when they signed agreements containing "works made for hire" provisions, as this language was an "express assertion of sole authorship or ownership" and reflected a "repudiation" of any authorship or ownership claim by the artists.

Judge Kaplan held that the gravamen of the artists' claim is UMG's refusal to recognize their

termination rights and that termination rights are, by their very nature, about the "nature, extent, or scope of copying" a particular work. On that basis, Judge Kaplan ruled that it is impossible for there to be a legally cognizable infringement claim until a termination right vests, a valid and timely termination notice is sent and ignored, and the copyright's grantee continues to distribute the work.

In reaching this conclusion, Judge Kaplan had to distinguish *Aday v. Sony Music Entertainment*, 96-cv-0991 (S.D.N.Y. 1997), in which the artist Meat Loaf sought a declaration, 30 years after entering into a work-for-hire agreement, that he had always been the sole owner of his copyright. The district court held that the three-year statute of limitations began to run in 1977, when Meat Loaf was put on notice "about any of the problems with the 'work for hire provision'" and his ownership claim this was time-barred.

Judge Kaplan may have reached the correct result, but it can be difficult to reconcile many of the statute of limitations decisions in copyright ownership or authorship cases. The law in this area is a thicket.

While Judge Murphy conceded it could still lead to difficult questions in many cases, his suggestion that a limitations period should not begin to run until a complete and present cause of action has accrued could provide greater clarity and more consistent outcomes in this area.

# Where This May Lead

Should the Supreme Court someday reject the discovery rule for the Copyright Act statute of limitations, the results could be harsh. It would certainly impact a copyright owner's ability to pursue acts of infringement of which the owner was unaware or by reasonable diligence could not have learned, especially where there is no basis for equitable tolling like fraudulent concealment. The change may also require courts to reassess the plain-and-express-repudiation test in ownership and authorship cases, which follows the discovery-rule model.

But even putting aside such a ruling from the Supreme Court, application of the plain-and-express-repudiation test to ownership or authorship disputes can lead to results that are difficult to reconcile. While dispensing with a discovery rule may lead to more late-filed, opportunistic attacks by purported authors or owners, which might otherwise have been dismissed as time barred, Judge Murphy's suggested focus on whether a complete and present cause of action could be asserted deserves some consideration. In some cases applying this rule, the date when the statute of limitations begins to run may not change. But even if it resulted in fewer cases being time barred, unmeritorious ownership or authorship claims will presumably remain difficult to win (albeit expensive to defend).

\*\*\*\*\*

**Alexander Lawrence** is a partner in the Tokyo office of Morrison & Foerster LLP. He can be reached at ALawrence@mofo.com.

---

**Copyright 2020. ALM Media Properties, LLC. All rights reserved.**