K9NQchaO

1 | UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
2 | ------------------------------x

3 | CHRISTIAN CHARLES,

4 |                 Plaintiff,

5 |            v.                          18 Civ. 1196 (AJN) (KHP)
                                           REMOTE ORAL ARGUMENT
6 | JERRY SEINFELD, et al.,

7 |                 Defendants.

8 | ------------------------------x
                                           New York, N.Y.
9 |                                        September 23, 2020
                                           2:30 p.m.
10 |
Before:
11 |
                        HON. KATHARINE H. PARKER,
12 |
                                           Magistrate Judge
13 |
                              APPEARANCES
14 |
CLARK GUILDIN, ATTORNEYS AT LAW
15 |      Attorney for Plaintiff
BY:   PETER L. SKOLNIK
16 |
GIBSON DUNN & CRUTCHER LLP
17 |      Attorneys for Defendants
BY:   ORIN SNYDER
18 |      DAVID M. KUSNETZ

19 |

20 |

21 |

22 |

23 |

24 |

25 |

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K9NQchaO

```
 1              (The Court and all parties appearing telephonically)
 2              THE COURT:  Good afternoon.  This is Judge Parker.
 3         Chris, will you please call the case.
 4              DEPUTY CLERK:  Will do, Judge.
 5              Judge, Alena Lynch will be our court reporter for
 6    today.
 7              Calling case 18 Civ. 1196, Charles v. Seinfeld, the
 8    Honorable Katharine H. Parker presiding.
 9              Would counsel for plaintiff please make your
10    appearance for the record.
11              MR. SKOLNIK:  Good afternoon, your Honor.  This is
12    Peter Skolnik for Christian Charles.
13              THE COURT:  Good afternoon.
14              DEPUTY CLERK:  Counsel for defendant, would you please
15    make your appearance for the record.
16              MR. SNYDER:  Yes.  Good afternoon, your Honor.  It's
17    Orin Snyder, and I'm here with David Kusnetz.  We represent
18    Jerry Seinfeld, Columbus 81 Productions, and Comedians in Cars,
19    LLC.  I'm here with my colleague, David Kusnetz.  I think I
20    said that already.
21              THE COURT:  Great.  Yes.  Good afternoon.
22              MR. SNYDER:  Good afternoon.
23              THE COURT:  All right.  A few preliminaries before we
24    get started.  Normally I would be seeing you in my courtroom,
25    but because we are still in the midst of the COVID pandemic, we
```

K9NQchaO

1    are conducting this oral argument by telephone.  This line is

2    open to the press and public on a listen-only basis, and I want

3    to remind everybody on the call that court rules prohibit the

4    recording and rebroadcasting of court conferences including

5    this one, and that violations of this rule will result in

6    sanctions.

7          I would also ask that everyone on the phone keep your

8    phone on mute.  This will help with reception so that everybody

9    can hear clearly, and to state your name before speaking.  That

10   is for the benefit of our court reporter, Ms. Lynch.

11         I also want to ask the parties to interrupt the

12   proceedings if you cannot hear something that has been said.

13   The court reporter I know will interrupt the proceedings if she

14   has not heard something clearly, but it's important that

15   everybody hear.  Those are the preliminaries I wanted to

16   review.  And this is defendant's motion for attorneys' fees and

17   costs.

18         So, Mr. Snyder, do you want to start or is your

19   colleague going to argue?

20         MR. SNYDER:  I'm going to proceed, your Honor.  Thank

21   you.

22         THE COURT:  OK.

23         MR. SNYDER:  Good morning, your Honor.

24         Not every losing copyright case wants attorneys' fees,

25   but this losing copyright case as you saw in our brief really

K9NQchaO

```
1    is a paradigm case for an award of attorneys' fees under the
2    Copyright Act.  If you look at Judge Nathan's decision, the
3    Second Circuit summary order decision, the transcript of the
4    Second Circuit argument which we've provided, what emerges is a
5    picture of a lawsuit that never should have been filed in the
6    first place.  It was objectively unreasonable from the get-go,
7    and plaintiff was warned repeatedly before he filed his lawsuit
8    when he was proceeding, when he had lawyer number one who
9    withdrew right after he filed a motion to dismiss, and then
10   lawyer number two.  Each was warned clearly that we were not
11   going to pay any ransom in this case despite the negative
12   publicity; that Mr. Seinfeld would spend money as much as he
13   needed to reasonably to clear his name from the allegations of
14   theft, and no more pernicious allegation can be brought against
15   a creative person than calling that person a thief.
16   Mr. Seinfeld obviously takes pride in his art, and the
17   plaintiff was making what were really odious allegations, and
18   he was warned at every step that he would lose because the
19   Second Circuit law was crystal clear.  He would lose because
20   the arguments he was advancing and the allegations he made had
21   been made time and again by plaintiffs who lost similar cases
22   with similar arguments, all of which were affirmed by the
23   Second Circuit, and that this was a mirror image of those
24   losing cases, and that we would be here one day.  We didn't
25   know we'd be in a pandemic.  We didn't know it would be by
```

K9NQchaO

1   phone, but we knew and we repeatedly -- at least three times,

2   if not more -- that there would come a day when he would be

3   held accountable and we would ask the plaintiff to pay our

4   attorneys' fees.  And that day has come.

5            THE COURT:  Mr. Snyder, let me ask you a question.

6   The plaintiff's counsel, Mr. Skolnik, has said that -- as I

7   understand his argument, that he was arguing for a novel issue

8   of law or for a change in the law, and cites the recent *Everly*

9   case as a basis for supporting his position that the case was

10  not frivolous to begin with.

11           MR. SNYDER:  Right.

12           THE COURT:  So what do you say about that?

13           MR. SNYDER:  Let me address it, your Honor.

14           It's nonsense.  And he used that this is a novel

15  argument -- this is a novel case twice.  First he used it with

16  Judge Nathan, and he said there's a difference between

17  authorship and ownership.  He was shut down summarily because

18  that claim is discredited, has been discredited by the Second

19  Circuit in the *Kwan* case and the *Simmons* case, which Judge

20  Nathan cited and the Second Circuit cited.  So the first time

21  he used that this is a novel case argument was in his core

22  theory, and Judge Nathan disagreed saying that the set of facts

23  in *Kwan* largely mirrored the present case, meaning this notion

24  that you call yourself an author or an owner has some legal

25  distinction for statute of limitations is frivolous on its face

K9NQchaO

1    because it has been directly rejected by the Seventh Circuit.

2          In the summary order, the circuit said when ownership

3    is the dispositive issue in an infringement case and the

4    ownership claim is time-barred, then the particular claim

5    itself is also time-barred even if any allegedly infringement

6    activity occurred within the limitations period.

7          So, this notion that his original argument was novel

8    and was laughed out of court, and I'll tell you, you know, and

9    I just -- if you listen to Judge Lynch on the tape that we

10   provided, no greater jurist on the Second Circuit than Judge

11   Lynch.  And he said, "It seems to me a very remarkable

12   proposition that you can allow this to go forward and only at

13   your convenience after the other side, meanwhile, has invested

14   money in trying to develop the product and just come after them

15   when it suits your convenience many years later."  Not only did

16   Judge Nathan throw him out of court on that novel argument, but

17   the Second Circuit did.

18         So now he comes to your Honor and says, no, there's a

19   new novel argument.  The new novel argument is there's some

20   circuit slip.  And what he doesn't say -- I'll get to *Everly* in

21   a moment -- he doesn't say under Second Circuit law, which, of

22   course, governs *Kwan* and other cases we cite, his case is

23   objectively reasonable.  He doesn't make that argument.  He

24   doesn't say "Under *Kwan* my case was novel" because he can't.

25   It's an absurd argument because the case law is so clear.

K9NQchaO

1          So now he says the Sixth Circuit's decision this past

2     May creates a circuit split and demonstrates that the Second

3     Circuit got it wrong because plaintiff's claims for

4     infringement of his copyright interest as author didn't accrue

5     and the statute of limitations was not triggered by

6     Mr. Seinfeld's clear repudiation.  This argument is as wrong as

7     wrong can be.  If you read *Everly*, it is clear that there is no

8     circuit court split at all.

9          Our reply brief makes clear that the Sixth Circuit did

10    not hold that authorship claims are subject to a different

11    statute of limitations regime than ownership claims.  The Sixth

12    Circuit held exactly what the Second Circuit held, exactly what

13    Judge Nathan held in her decision; that the test for

14    repudiation of authorship is exactly the same as the test Judge

15    Nathan applied to dismiss plaintiff's ownership claims

16    time-barred and that the Second Circuit applied in its summary

17    averment.

18         So that *Everly* isn't harming me with the Second

19    Circuit test, the decision itself, if you read it, which I did

20    again this morning, it says that the test for the repudiation

21    of ownership is derived from the Seventh Circuit's test for the

22    repudiation of ownership claims.

23         This is what *Everly* says, quote -- I just circled the

24    language about an hour ago -- "The express repudiation test

25    should apply to such a claim for declaration of authorship

K9NQchaO

1    rights as it does in the ownership context."

2             So, Judge Nathan and the Second Circuit held that

3    Mr. Seinfeld made these private and public repudiations six

4    years before plaintiff filed suit.  Under *Everly*, under the

5    Sixth Circuit's decision, Mr. Seinfeld's statement that the

6    plaintiff was working on a work-for-hire basis and his decision

7    to release the show in 2012 without crediting plaintiff was a

8    repudiation, both of plaintiff's claim to ownership and his

9    claim to authorship.

10            There is nothing novel here.  All plaintiff is doing

11   is attaching the label model to first below arguments that were

12   thoroughly discredited by the Second Circuit case after case,

13   and now because he has nothing to hang his hat on, he has

14   completely butchered this Sixth Circuit case.  And so even if

15   the *Everly* test for repudiation of authorship claims governed

16   in the Second Circuit, the result would be the same.  It's the

17   same standard.

18            This is why when Mr. Skolnik peddled this argument to

19   the Second Circuit in seeking re-hearing from the Second

20   Circuit's decision, the Second Circuit denied the petition

21   without requesting any responsive briefing from us.  There is

22   no circuit split.  No commentator or other case has identified

23   a circuit split.  There is nothing controversial about the

24   Second Circuit's or Sixth Circuit's jurisprudence which says

25   that if you repudiate a claim of authorship or ownership -- it

K9NQchaO

1    doesn't matter what you call it -- you have three years to sue,

2    and he did not sue, and it is not a close call.  This is as

3    frivolous as a copyright case can be in the three-year statute

4    of limitation repudiation regime.

5         The reason I say that is, your Honor, there -- what

6    the Second Circuit looks at under 505 of the Copyright Act is

7    frivolousness, motivation, and objective unreasonableness.  On

8    objective unreasonableness, I just went through why his

9    arguments were from day one dead on arrival.

10        If you look at the Second Circuit's summary order, the

11   language is clear that his whole argument was there's a

12   difference between ownership and authorship, and the Second

13   Circuit held the central issue is clearly, clearly a dispute

14   over ownership.  And then he also wrote plaintiff's argument is

15   seriously undermined by his own statements.

16        So the court is using superlative language in its

17   summary order consistent with the commentary all three judges

18   made during the argument that we cite in our brief, that this

19   was a shakedown case.  And the reason I say that is on the

20   motivation factor, plaintiff who is, you know, an experienced

21   individual in the entertainment industry -- I'm sure he reads

22   the trades -- knew that this show was out there, was winning

23   awards, and he wasn't credited on it, but he only sued when he

24   saw the money because Netflix announced this lucrative deal.

25   The trade said a hundred million dollars.  It doesn't matter

K9NQchaO

1   what the amount was.  We will stipulate that it was a lucrative

2   deal for Mr. Seinfeld.  And he knew that suing a man like

3   Mr. Seinfeld would attract widespread media attention.  That's

4   just self-evident.  And Judge Koeltl in the *Porto* case which we

5   cite saw a similar scenario, and he said that targeting a

6   high-profile defendant like this has the hallmarks of an

7   abusive lawsuit.  And to target Mr. Seinfeld again with

8   allegations of theft, it's a well-known tactic used by

9   plaintiffs to try to extract a settlement.

10          And the *Porto* case is on point because there, as here,

11  the plaintiff waited to sue, waited in the wings, came out of

12  woodwork when he saw a pot of gold, and was warned, as here,

13  that the case was frivolous.  And on that point, your Honor,

14  you know, the stakes here were really high.  The case may have

15  been frivolous and objectively unreasonable from the outset,

16  and it was, and just because Mr. Skolnik flashed a label that

17  these were novel issues, the case law makes clear that they

18  were bankrupt discredited issues allegations, which we made

19  clear in our letters, which look a lot like our motion to

20  dismiss.

21          Each time he wrote a letter, plaintiff or his counsel,

22  they were lengthy citing all of these cases.  And whether they

23  assumed we were going to cave and pay money or whatever other

24  reason, this is serious, and the stakes were high because as

25  plaintiff alleges, the industry press estimated that the

K9NQchaO

| | |
|---|---|
| 1 | Netflix deal was worth a hundred million dollars, and plaintiff |
| 2 | was seeking Mr. Seinfeld's entire share of the show's profit, |
| 3 | as well as an injunction on making future episodes or |
| 4 | distributing existent ones.  And with those stakes, we were |
| 5 | forced to vigorously defend our rights. |
| 6 | And going to the final issue of my argument, two |
| 7 | issues, which I can combine, you know, the whole reason |
| 8 | Congress passed Section 505 of the Copyright Act was for |
| 9 | deterrence and compensation.  And Judge Preska said it best in |
| 10 | a case that's often cited when attorneys' fees are awarded in |
| 11 | capitur cases, in the *Baker v. Urban Outfitters* case, and she |
| 12 | wrote, "A award of fees and costs is necessary to convince |
| 13 | plaintiffs that federal courts do not exist so they can roll |
| 14 | the dice on unreasonable allegations or so that they could seek |
| 15 | fame and fortune from deep-pocketed defendants." |
| 16 | And, you know, when people come to this court and |
| 17 | invoke its powers, it's critical in the copyright area where |
| 18 | the Copyright Act is designed to foster creativity and creative |
| 19 | works, and when someone comes to court with a frivolous |
| 20 | allegation, parties -- whether they're Jerry Seinfeld or a |
| 21 | struggling artist -- you know, need to be compensated both |
| 22 | because it's the fair and right thing to do and then future |
| 23 | plaintiffs need to be deterred because you can't take a free |
| 24 | shot in the hope that something will land or that big |
| 25 | companies -- you know, they sued Netflix, they sued Sony, they |

K9NQchaO

1    sued Mr. Seinfeld, I'm sure thinking that they'd get a check

2    because people write checks.  But, unfortunately for the

3    plaintiff, this was the wrong case and the wrong defendant

4    because my client will not pay ransom.  And in addition to

5    being one of the funniest men in the world, Mr. Seinfeld is

6    also one of the most successful men in show business, and

7    because of his talent and success, Netflix offered him a deal

8    to acquire the rights to this show, and this was a seminal deal

9    for Netflix, and it served as another capstone on

10   Mr. Seinfeld's successful career.

11           And as Judge Nathan recognized, it was this

12   announcement in 2017 that prompted plaintiff to come out of the

13   woodwork and then threaten a lawsuit.  He didn't file one.  He

14   first threatened one privately.  The implicit message is:  If

15   you don't pay me, I'm going to sue you, and, of course, there

16   were headlines about the lawsuit that were dramatic and

17   inflammatory, and now it's time for accountability.

18           THE COURT:  OK.  Mr. Snyder.

19           MR. SNYDER:  Can I say the last point?

20           THE COURT:  You can.  I just want to ask you a

21   question.

22           MR. SNYDER:  OK.  Go ahead.

23           THE COURT:  Which is that wouldn't you want a

24   plaintiff to raise the issue before just bringing a lawsuit?  I

25   mean, most defendants would want to have an opportunity to

K9NQchaO

1   learn about the case before it's filed and to potentially

2   negotiate something if it was appropriate, if they deemed it

3   appropriate.

4           MR. SNYDER:  Well, I would say this:  That if there

5   was a good faith dispute for sure, but when you get a demand

6   letter and it's frivolous and then you point out how frivolous

7   it is -- and, again, if you read my first letter to plaintiff,

8   it reads much like my motion to dismiss briefs three.  We had

9   to file three.  We had to go through three rounds of briefing.

10  It reads much like Judge Nathan's decision.  It reads much like

11  the Second Circuit's -- our briefs on appeal, and it reads much

12  like the Second Circuit's both comments on the bench and its

13  summary order.

14          There was no novelty here.  There was no mystery here.

15  This case was as dead on arrival as a copyright case can be.

16  I've been practicing copyright for a lot of years, 30 years.

17  Mr. Skolnik too.  He is very experienced.  And no one with a

18  straight face can look at this case with the repudiations that

19  occurred with the Second Circuit case law as it is and think

20  that this was going to stick.  It wasn't a close call ever, and

21  there was nothing novel.  You can take every argument that

22  Mr. Skolnik made below and track it to arguments that were made

23  in other cases where the Second Circuit affirmed dismissals.

24  There was no open -- there was no opening. there was no crack

25  in the jurisprudence.  There was no open, dangling issue.  This

K9NQchaO

1    is as clear as clear can be.  And that's why he's now pivoted

2    to this Sixth Circuit argument, and I don't know how with a

3    straight face anyone can say that the Sixth Circuit created a

4    conflict when it cites the Second Circuit case law in support

5    of its outcome, which is consistent with the Second Circuit's

6    outcome here.

7              THE COURT:  OK.

8              MR. SNYDER:  And not to be too dramatic about it, but

9    if there -- this is a very common fact pattern.  People come

10   out of the woodwork.  They sue big companies and they sue

11   creative people, and they say now that you're show is a success

12   I'm an owner of it.  You know, I handled a case years ago

13   involving Rent that resulted in a Second Circuit decision,

14   there the plaintiff a day after the show came out on Broadway,

15   you know, filed a notice and said, "I'm a co-author."  This

16   fact pattern of waiting in the shadows, wait for succeed and

17   then suing is common, which is why the jurisprudence is so

18   consistent, and it's why when people like this plaintiff, you

19   know, file lawsuits in clear violation of this case law, it's

20   important for them to be held accountable because this is an

21   abusive fact pattern, and in some cases, you know, it can be

22   very, very costly and disruptive.  Netflix and everyone else

23   made their deals, and this guy comes out of the woodwork and

24   raises his hand and says, "I'm entitled to all the profits."

25             THE COURT:  I understand the point that you are

K9NQchaO

1    making, Mr. Snyder.  A couple other questions that I have.  In

2    Mr. Skolnik's brief, he indicates that he is intending to file

3    a petition for cert. with the U.S. Supreme Court, and if that

4    happens, does that render this motion premature.  There would

5    be additional fees associated with that, and so I want your

6    position on that.

7         MR. SNYDER:  Sure.  Thank you, your Honor.

8         As I understand it, from my colleague David Kusnetz --

9    I haven't looked it up myself -- but he does say that he is

10   going to appeal to the Supreme Court, but to our knowledge,

11   plaintiff has not filed a cert. petition to the United States

12   Supreme Court, and his time to do so expired weeks ago, so I

13   think that this case is final.  That's setting aside (A)

14   whether he filed it timely, whether it would have been granted,

15   which is a one in a million, and (2) if he wants to seek relief

16   from, you know, his lateness, that's one in, you know, five

17   million.  So as far as I'm concerned, the case is over.

18        THE COURT:  Then another question that I have for you,

19   Mr. Snyder, is in your brief, you indicated that the fees that

20   you are seeking represented a 25 percent discount from your

21   regular --

22        MR. SNYDER:  Yes.

23        THE COURT:   -- rate, your regularly charged rate.

24        So maybe this is just my confusion, but the total

25   amount that you're requesting, does that already factor in the

K9NQchaO

1    25 percent discount?

2            MR. SNYDER:  Yes, your Honor, it does, and it's

3    something I just -- it's my practice to always give myself a

4    haircut even though courts have upheld similar rates at a

5    hundred percent just because, you know, the numbers are

6    obviously significant, and so I think it's a reasonable thing

7    to do, but the answer is yes, the amount sought reflects the

8    self-imposed 25 percent discount.

9            THE COURT:  OK.  Thank you.

10           Mr. Skolnik, I will hear from you next.

11           MR. SKOLNIK:  Thank you, your Honor.

12           Let me address very quickly a point that Mr. Snyder

13   just made about the timing of my cert. petition.  Mr. Snyder is

14   apparently not aware that back in March the Supreme Court

15   automatically extended the time to file cert. petitions from

16   the existing 90 days to 150 days.  As it turns out, I was also

17   unaware of that, and I filed a motion to extend with the late

18   Justice Ginsburg, and it was returned on the grounds that it

19   was unnecessary because there had been an automatic extension.

20   So I am in fact still planning to file that cert. petition, and

21   it is timely.

22           Mr. Snyder, you know, said he didn't want to be overly

23   dramatic but he was, as he often is, both very dramatic and

24   very glib.  I had said in my opposition that it is this motion,

25   this motion for fees that is frivolous, and in fact

K9NQchaO

1   Mr. Snyder's argument has raised that frivolousness to new

2   heights.

3          Let's not forget that, as he clearly forgot or didn't

4   bother to mention, that Mr. Charles and Mr. Seinfeld had an

5   18-year relationship as collaborators before all of this arose.

6   18 years.  And when Mr. Seinfeld came to Mr. Charles for help

7   with his career, which at that point was floundering because he

8   had just come off a semi-disastrous B movie -- that is what it

9   was called, a B movie -- and a totally disastrous television

10  show called The Marriage Ref, and his managers were urging him

11  to do something to get back in the game, it was Mr. Charles who

12  came up with the idea of Comedians in Cars Getting Coffee.

13         But, look, let's not lose sight what this motion is

14  about.  It is not to re-litigate Mr. Seinfeld's motion to

15  dismiss.  It is not to argue whether the Second Circuit panel

16  was right or wrong.  It is not to decide whether the Second or

17  the Sixth Circuit has the better or more correct interpretation

18  of the efficacy of repudiations.  It's not even to decide if

19  the gravamen of Mr. Charles' suit is properly seen as a dispute

20  about copyright authorship or ownership.  This motion is about

21  whether the defendants are entitled to almost a million dollars

22  in legal fees because Mr. Charles filed a complaint that is

23  frivolous and objectively unreasonable.

24         From the outset, Mr. Charles argued that Second

25  Circuit law had never answered the question whether his

K9NQchaO

authorship could be repudiated by Mr. Seinfeld, who was not an

author, who did not claim to be an author, and he did not

become an author by the required written work-for-hire

agreement or any other transfer of Mr. Charles,' rights and who

was therefore, in Mr. Charles's paradigm, a stranger to the

copyright.

From the outset, Mr. Charles argued that this was a

question of first impression in the Second Circuit.  The

question had not been answered by Judge Pooler's decision in

*Kwan v. Schlein*.  It had not been answered by *Simmons v.*

*Stanberry*.  It had not, in fact, your Honor been answered by

any federal court in the country.  Mr. Charles argued that the

answer to that question of first impression, whether a stranger

to a authorship copyright had the power to trigger the statute

of limitations through repudiations, whether the answer to that

question should be no, such attempts to repudiate are

ineffectual:  They do not cause accrual of a claim under

Section 507(b) of the Copyright Act.  They do not trigger the

running of the three-year statute of limitations period.

Because the question had never been answered at the

time that Mr. Charles filed his suit, here or elsewhere, it was

both a question of first impression and, to use the language of

the requirements for a pleading under Rule 11(b)(2), it was

non-frivolous argument for extending, modifying, or reversing

existing law or for establishing new law.  So, that was the

K9NQchaO

state of federal copyright law when Mr. Charles filed his

complaint.

        And from my perspective, as a former professor of

international copyright law at Cardoza Law School, the

complaint unquestionably raised a non-frivolous argument to

extend or modify existing law for establishing the rule, and it

did so, your Honor, even before the Sixth Circuit decided

*Everly v. Everly.*  The Second Circuit rejected my argument.

Judge Nathan rejected my argument, but in the handful of days

between argument in the Second Circuit and its issuance of an

order, the Sixth Circuit provided its own well-reasoned answer

to that question of first impression that Mr. Charles had

raised, and it's an answer that eviscerates any argument that

Charles' complaint was frivolous or objectively unreasonable,

which, again, is the only question on this motion.

        *Everly* decisively held that a limitations triggering

in repudiation of ownership must be made by one who himself,

unlike Mr. Seinfeld, claims authorship.  *Everly* explains that

the only repudiation that would have triggered the statute of

limitations was a repudiation of Mr. Charles' authorship by

another author.

        Here is what the *Everly* court said -- and it said it

unambiguously; I am not paraphrasing now.  I'm quoting: "An

authorship claim will not approve until the putative author

status as an author is expressly repudiated.  Actions

K9NQchaO

repudiating ownership are irrelevant to begin the statute of
limitations for an authorship claim because repudiations of
ownership is not adverse to the author's claim as such."
That's one quote.

          Another:  "regardless of whether repudiation of
authorship is made privately, publicly or implicitly, it must
come from someone asserting authorship of the work, not from a
third party."

          Here is another quote.  "A person's authorship of a
work can be legally called into question only if it is
challenged by another person who himself claims authorship of
the work in question."

          Finally, your Honor, another quote:  "In the context
of authorship disputes, expressly, repudiation must be made by
an author herself because, unlike ownership, authorship is not
transferable by contract.  Thus, the person repudiating
another's authorship must herself have a claim in authorship in
the work in question."  Those are all direct quotes from
*Everly*.

          The Court should give no weight to defendant's
suggestion that frivolousness was implied by the prompt denial
of Mr. Charles's request for panel re-hearing.  Our opposition
explains that the Second Circuit, like most others, is famously
reluctant to propagate intra-circuit conflict, and it is even
more reluctant to reconsider its decisions based on authority

K9NQchaO

1   from outside the circuit.

2          Let me take a moment to address some of the

3   defendant's arguments on reply which Mr. Snyder has reiterated

4   during his argument.  Most of the reply tries to re-litigate

5   the facts and the merits of defendant's motion to dismiss; not

6   to addressing whether the complaint was frivolous and

7   objectively unreasonable.  They insist that when Mr. Seinfeld

8   asserted that Charles had only a "work-for-hire interest" in

9   the pilot, he was implicitly repudiating Mr. Charles'

10  authorship.

11         Well, first, the record is clear that Mr. Seinfeld was

12  seeking to devalue only Mr. Charles' rights as the pilot's

13  director, not as its author.

14         Second, under the *Everly* approach, it wouldn't matter

15  if Seinfeld was repudiating, implicitly or explicitly, since he

16  was not an author.  Seinfeld did not even imply he was an

17  author until a month before Mr. Charles sued.  And, of course,

18  defendant's work-for-hire argument slides right by the

19  undisputed fact that no work-for-hire agreement was ever

20  executed, and Mr. Seinfeld cannot call upon the work-for-hire

21  doctrine to claim that he is, therefore, an employer who is

22  "considered the author" under Section 201(b).

23         Defendants also insist that the question of

24  frivolousness must consider only existing Second Circuit law,

25  but that argument ignores both that Charles raised a question

K9NQchaO

 1    of first impression and that he was making a bid to extend or

 2    modify existing Second Circuit law.

 3             Your Honor, defendant's reply brief and Mr. Snyder's

 4    argument would have you believe that the Sixth Circuit's test

 5    for repudiation of authorship is identical to the Second

 6    Circuit's test for repudiation of ownership, and that *Everly*

 7    applies the same test that this court and the Second Circuit

 8    applied in this case.  That argument is slick and glib and

 9    wholly disingenuous.  They sewed together a garment whose

10    tortured seams are showing.  They piece together an *Everly*

11    phrase from here, a snippet from there; disembodied quotes

12    pulled out of context from cases drawn from hither and yon.

13    It's a tattered costume that adds up to nothing because it does

14    not and cannot refute *Everly*'s actual holdings that a person's

15    authorship of a work can be legally called into question only

16    if it is challenged by another person who himself claims

17    authorship of the work, and an authorship claim will not accrue

18    until the putative author status as an author is expressly

19    repudiated.

20             Actions repudiating ownership are irrelevant to begin

21    the statute of limitations for an authorship claim.  Those

22    holdings are directly 180 degrees contrary to the Second

23    Circuit's tacit conclusion.  *Everly* examined all species of

24    repudiations, including through the absence of credit and the

25    nonpayment of royalties.  It analyzed cases from around the

K9NQchaO

nation, including, among many others, Judge Pooler's decision

in *Kwan v. Schlein* and *Simmons v. Stanberry*, but in the end

*Everly* swept them all aside because all of them failed to

address who qualified to repudiate copyright authorship.

Is the Sixth Circuit conclusion *Everly* right?  I

submit as a matter of logic and policy it is, but it doesn't

matter for purposes of this argument.  This Court is not called

upon to decide.  I will be filing a cert. petition with the

Supreme Court urging it to decide which of those diverse views

from the Second or Sixth Circuit, which of those views should

prevail.  Since two courts reach different conclusions, it

cannot be said that the position argued to either one of those

courts was frivolous or objectively unreasonable.

What does matter today, and it is all that matters

today, is that reasonable minds, reasonable judges and

reasonable circuits can differ; and because that is so, no

reasonable mind, no reasonable judge, no reasonable lawyer can

conclude that raising the question was frivolous or objectively

unreasonable.

So, your Honor, I will end this argument for now where

I began my opposition to defendant's motion.  The only

frivolous and objectively unreasonable matter before this Court

today is defendant's shameful motion, which entirely ignored

*Everly*'s very existence until Charles placed it squarely in the

court's gunsights.

K9NQchaO

1          THE COURT:  Thank you, Mr. Skolnik.  How do you

2     address Mr. Snyder's argument that your client has changed

3     positions as to the issue before the Court, the settlement

4     issue before the Court --

5          MR. SKOLNIK:  Your Honor, there has been absolutely no

6     change of position.  Our position has consistently been that

7     the question of whether or not as a non-author Mr. Seinfeld had

8     the power to repudiate Mr. Charles' authorship, whether or not

9     that has ever been addressed, and we have taken the position

10    from the beginning that Judge Nathan's opinion didn't address

11    it, that the Second Circuit didn't address it; and we have now

12    simply said, well, finally, some court did address it, but the

13    question has never been other than that.

14         THE COURT:  OK.  And how do you distinguish the *Porto*

15    case that Mr. Snyder discussed?

16         MR. SKOLNIK:  Well, your Honor, you know, the -- I

17    will confess that I don't have the facts of *Porto* front to

18    mind.  I'm not even sure that it was briefed by either of

19    defendants submissions.  But to the extent that it simply says

20    that, you know, there is a deterrence effect by the structure

21    of the Copyright Act's requirement for a three-year period of

22    repose and that courts should punish frivolous plaintiffs, all

23    I can say is that this plaintiff's claims were not frivolous to

24    begin with.  They have been shown not to be frivolous now.

25              And in terms of deterrence, look, from the beginning

K9NQchaO

1   Mr. Charles and his -- I'm sorry -- Mr. Seinfeld and his

2   colleagues, including his manager, his business manager, even

3   according to some, his wife thought that Mr. Seinfeld was wrong

4   about this, was being unduly stubborn, was not recognizing what

5   Mr. Charles had done, and they were saying all of that at the

6   same time that they were constantly saying that there was no

7   money in this show.  Mr. Seinfeld made that same statement to a

8   mutual friend once the show was running for a few years on the

9   Crackle platform.  You know, there were no indicia that there

10  was any money to be had here.  The fact that Mr. Charles was

11  not credited on the show is in its own way an outrage because

12  the simple reason for that is that Mr. Seinfeld took the

13  extraordinary step of seeing to it that nobody got any credits

14  on the show.  We all know when we watch a television show now,

15  we're likely to spend the last five minutes, if we have the

16  stomach for it, watching the credits.  They credit everybody

17  from the assistant to the second assistant hairdresser.  There

18  are no credits whatsoever on Comedians in Cars because

19  Mr. Seinfeld apparently recognized that that would be a nice

20  way of simply avoiding what role, if any, Mr. Charles had ever

21  played.  So, you know --

22          THE COURT:  OK.  Thank you.

23          The other question that I have for you is if you are,

24  in fact, intending to serve and file a petition for cert., do

25  you believe that this motion is premature and that its outcome

K9NQchaO

1   should await resolution on your anticipated cert. petition?

2                 MR. SKOLNIK:  Well, I have two views of that.  One is,

3   I think it in fact may be premature, and I think that, you

4   know, the problem is that denial of a cert. petition -- you

5   know, when I file my cert. petition, which I don't have to do

6   now until sometime in early November, as Mr. Snyder recognizes,

7   most cert. petitions are denied.  So that denial may come very

8   simply, very quickly, and without the defendants having to

9   spend another ten minutes worrying about it or responding to

10  it.  You know, there's no obligation for them to oppose a cert.

11  petition.  So, in that regard, the whole question of whether

12  additional fees would accrue prior to the time that the cert.

13  petition was filed and ruled upon, if that ruling is in the

14  negative, might have little or no impact whatsoever on the

15  question of fees.

16                 But beyond that, my other answer to the question is,

17  should I be unsuccessful on this motion, as I certainly hope I

18  won't be, I will certainly consider whether or not my cert.

19  petition should include not only the issue of the circuit split

20  between the Second and Sixth Circuits and there is --

21  regardless of what Mr. Snyder is arguing, there is absolutely a

22  circuit split on that base question of who has the power to

23  repudiate.  But if I were to lose this motion, I would

24  certainly have to consider whether or not I would ask the

25  Supreme Court also to address the proper standard for

K9NQchaO

1    evaluating claims of frivolousness and objective

2    unreasonableness in pursuing a fee motion.

3              THE COURT:  All right.  And then your opposition

4    rested principally on the argument that the lawsuit was not

5    frivolous or objectively unreasonable because from your reading

6    and interpretation of the laws, two circuits have come out

7    different ways on the issue, which I understand either to be

8    arguing that per se that would render the lawsuit not

9    frivolous.  You didn't say anything about the hours expended or

10   the rate.  Do you have anything that you wanted to argue about

11   the reasonableness of the hourly rate requested or the hours

12   expended?

13             MR. SKOLNIK:  Well, to be candid, your Honor, no.  I

14   intentionally did not address that in my opposition, frankly,

15   because I think that, you know, their entire fee petition,

16   putting aside the calculation of the requested fees based upon

17   their hourly rates, their entire fee petition rests on the sole

18   proposition that Charles' complaint was frivolous and

19   objectively unreasonable.  And because I found that after

20   *Everly* had been decided to be such an outrageously myopic

21   position, it struck me that to waste time challenging whether

22   or not Mr. Snyder is entitled to $900 an hour or $3 million an

23   hour, I'm not going to sit here and argue with him about what

24   his rates are.

25             I think that given how wrong he has been on this case

SOUTHERN DISTRICT REPORTERS, P.C.

K9NQchaO

1    from the beginning, whatever he charged was excessive, but I'm

2    not throwing that into the mix here.  I just done like to get

3    into quarrels with other lawyers about how much they should be

4    charging or how much time they are spending.

5              I will note in passing, as long as we're on this

6    subject, that their calculation of the time spent incorporates

7    what seemed to be a fairly remarkable number of hours for their

8    three different motions to dismiss.  And I say a remarkable

9    number of hours, because their motion to dismiss never changed.

10   It was almost paragraph by paragraph cut and paste from one of

11   their motions to dismiss to the next.  So, how it is that they

12   racked up all of these additional hours with the subsequent

13   motions to dismiss sort of escapes me.  But what are we going

14   to do, have an interrogation to ask them why they had to spend

15   27 hours researching the question that they had already

16   researched and briefed the time before?  It's not the way I

17   like to practice law, your Honor.

18             THE COURT:  I see.  OK.  Thank you very much.

19             Mr. Snyder, is there anything else that you would like

20   to address that you haven't addressed already?  Mr. Snyder?

21             MR. SNYDER:  I'm so sorry, your Honor.  I was on mute.

22             Yes, your Honor, just briefly.  I want to just respond

23   to a couple of the arguments.  First is, I hope your Honor

24   doesn't buy into the fiction – and it is a fiction – that there

25   is a circuit split.  There is no circuit split.  There are no

K9NQchaO

1   diverse views that the Second and Sixth Circuit both apply the

2   exact same uniform rule and every circuit that has addressed it

3   that the statute of limitations is an absolute bar if you don't

4   sue in three years, and it doesn't matter whether you call it

5   an authorship claim or an ownership claim, there is no split,

6   and no reasonable mind, judge or circuit, can adopt

7   Mr. Skolnik's arguments.  We've addressed this in our reply and

8   cases on their face make it clear, there is no circuit split.

9            Two, on the frivolousness, I hope your Honor also

10  doesn't buy into the idea that this was a non-frivolous

11  argument to extend or modify law.  All you have to do is look

12  to Judge Nathan and the Circuit to see that this was *Kwan* in

13  mirror image.  There was no issue of first impression there.

14  Mr. Skolnik is not the first lawyer to say ownership and

15  authorship are different.  The Second Circuit has made clear

16  time and again that if you have notice and you don't sue, and

17  it's six years later or three years a day, you're out of court

18  whether you call yourself an author or an owner.  Everything he

19  said on that point was what he said below, is what he said to

20  the Second Circuit, including the bizarre notion that

21  Mr. Seinfeld is a stranger to the show.  Every Judge, all four

22  of them, who considered that argument scratched their heads

23  because, of course, by saying to Mr. Charles, "I, Jerry

24  Seinfeld, am not going to give you anything other than a

25  work-for-hire status," he is obviously claiming to be the

K9NQchaO

1    author/owner of the show.

2            The next point is the -- in terms of prematurity, we

3    urge your Honor to decide the motion now.  One, cert. will be

4    denied as sure as day follows night.

5            And, second, in *Mahan*, which we cite, the Second

6    Circuit upheld a fee award by a district court and then ordered

7    the district court to calculate a fee award based on the fees

8    for making the appeal.  We're happy to waive attorneys' fees

9    for reading his cert. petition because certainly there will be

10   no opposition required.

11           The next point is that in terms of his non-comment

12   about our rates, our remarkable number of hours, I can tell you

13   that because Mr. Kusnetz swears that this is the case or

14   represents that this is the case, and I recall it as so, the

15   fact is that we did have to write new briefs each time because,

16   not surprisingly, each time we filed a motion to dismiss, the

17   plaintiff has to rejigger and re-engineer his amended

18   complaint, and we had to then accordingly deal with the new

19   allegations and claims that were raised in his new complaint,

20   including on one round they put in a dozen or so fact

21   affidavits.  We had to deal with that.

22           So, I just hope your Honor does not take either at

23   face value or accept in any way the idea that there is a

24   circuit splitting or that there is any issue of first

25   impression.  It's just not true, and so we hope that your Honor

K9NQchaO

will just apply the clear precedent that where you have the

motivation and the objective unreasonableness, like you do

here, attorneys' fees are appropriate.

        Oh, *Porto*.  We did cite *Porto* in our brief on page 15

of our motion, and what I think is most important about *Porto*

is that Judge Koeltl focused on the award-winning play and

award-winning author, he focused on the fact there was a

well-known director, who was an Academy Award winning actor.

He focused on the fact that several years after the production

of the play and its success the lawsuit was brought.  And then

focuses on another fact, which, "Plaintiff's first counsel was

warned before any action had been filed that there was no

colorable copyright infringement claim, and the plaintiff

nevertheless persisted in obtaining new counsel and filing his

complaint."  In this case, the facts are even more aggravating.

We warned, as I said, plaintiff in pro se capacity.  We warned

lawyer one.  We filed a motion to dismiss and the day before I

think his opposition was due, he withdrew, and Mr. Skolnik came

in, and we warned him anew more than once in that writing.  And

in that Judge Koeltl found that an award of reasonable cost of

attorneys' fees was appropriate, citing the aggravating factors

that we have here:  Famous defendants, successful play, waiting

in the shadows, and then being warned and barreling ahead in

the face of those warnings.  So even *Porto* is even a

less-compelling case for fees but Judge Koeltl comfortably

K9NQchaO

1    awarded them there.  Thank you, your Honor.

2               THE COURT:  Thank you.

3               MR. SKOLNIK:  Your Honor, may I respond briefly?

4               THE COURT:  Yes, you may, Mr. Skolnik.

5               MR. SKOLNIK:  Let me just say in terms of a few points

6    that Mr. Snyder either just made directly or indirectly.

7               First, is that there is a suggestion in their brief

8    that the Court should consider that Mr. Charles is apparently

9    well-healed because he was able to hire multiple lawyers.

10   Well, the fact is that every lawyer that has represented

11   Mr. Charles, or both of us, have been on contingency.  So

12   well-healed is nonsense.

13              For that matter, Mr. Snyder completely overlooks the

14   fact that the first lawyer withdraw not because he had lost

15   heart in the correctness of Mr. Charles' case but because he

16   was threatened with a conflict because some point years and

17   years ago, he had represented Sony.  It was something like

18   that.  But that was the reason that he withdrew, and I quickly

19   came in.

20              But in terms of there not being a circuit split, let

21   me just say that Mr. Snyder is, to use his own words "as wrong

22   as wrong can be."  I urge the Court to look closely at *Everly*

23   to decide whether or not it came to a different conclusion than

24   *Kwan v. Schlein*.  And Mr. Snyder keeps coming back to the *Kwan*

25   case, completely ignoring the fact that the significant

K9NQchaO

1    difference in *Kwan* was that the challenger -- that the

2    defendant was herself or himself an author.  That's the

3    distinction here.  That's the distinction I have been making

4    from the beginning; that Mr. Seinfeld is not an author, and a

5    non-author, and I have not said that Mr. Seinfeld is a stranger

6    to the show.  I'm saying that he is a stranger is to the

7    copyright because he doesn't own any copyrights.  He doesn't

8    own any copyright as a performer.  He doesn't own any copyright

9    because he didn't write a word.  He never claimed to write a

10   word, and that is the distinguishing factor between our case

11   and *Kwan* case and the *Stanberry* case and every other case that

12   has come along prior to *Everly*.

13          THE COURT:  OK.  I understand your argument.

14          I want to thank counsel on both sides for your

15   excellent arguments, and I will take this motion under

16   advisement.  Thank you very much.

17          We're adjourned.

18          (Adjourned)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300